*Decisions will be entered under Rule 50.*

ESTATE OF HERRICK L. JOHNSTON, DECEASED, MARGARET V. JOHNSTON, EXECUTRIX, AND MARGARET V. JOHNSTON, INDIVIDUALLY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3968-64. Filed November 26, 1968.

*James H. Larva,* for the petitioners.
*Conley G. Wilkerson,* for the respondent.

#### OPINION

TIETJENS, *Judge:* The Commissioner determined deficiencies in income taxes of petitioners as follows:

| Year | Deficiency |
|------|-----------|
| 1957 | $60, 353. 89 |
| 1958 | 7, 139. 17 |
| 1959 | 12, 249. 74 |
| 1960 | 4, 640. 66 |
| 1961 | 3, 508. 13 |

The only issue presented for our determination is whether certain property was "purchased" by Herrick L. Johnston on or before December 31, 1958, so as to constitute qualified replacement property within the provisions of section 1033(a)(3)(A) and (B) of the Internal Revenue Code of 1954,[1] so that the gain realized by him on the

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise noted.

involuntary conversion of other property in 1957, to the extent of $158,882.75, is entitled to nonrecognition for tax purposes under section 1033.

The facts have been fully stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference.

The petitioners are Margaret V. Johnston in her individual capacity, and the Estate of Herrick L. Johnston, deceased. Herrick L. Johnston died subsequent to the filing of the petition in this case.

Herrick L. Johnston (hereinafter sometimes referred to as Johnston or petitioner) and Margaret V. Johnston were, during the years 1957 through 1961, husband and wife who, during those years and at the time they filed this petition, resided in Columbus, Ohio. They filed joint Federal income tax returns for the taxable years 1957 and 1958 with the district director of internal revenue at Columbus, Ohio. They filed joint returns for 1959, 1960, and 1961 with the district director of internal revenue at Cincinnati, Ohio.

The parties have reached an agreement with respect to each adjustment to taxable income as set forth in the statutory notice of deficiency with the exception of a taxable gain realized in the taxable year 1957. The facts which relate to that issue are as follows.

In August 1955, Johnston purchased real estate in Columbus, Ohio, known as 540 West Poplar Street, for a total consideration of $56,985. The West Poplar Street property was conveyed, under threat of condemnation, to the State of Ohio on May 14, 1957, for a total consideration of $225,600, which was received by Johnston in 1957. After the deduction of $1,717.25 sales expenses net proceeds were $223,882.75. At the time of this sale the West Poplar Street property had an adjusted basis of $41,006.37. Consequently, Johnston realized a gain from the sale of the property of $182,876.38.

The sale of the West Poplar Street property constituted an involuntary conversion under the provisions of section 1033 of the Internal Revenue Code of 1954. For the purpose of replacing the property so converted, Johnston purchased property in Columbus, Ohio, known as the Kenny Road property, for $65,000 and property in Los Angeles, Calif., known as the Nordhoff Street property, for $200,000. The Kenny Road property constitutes qualified replacement property within the provisions of section 1033(a)(3)(A) and (B) of the Internal Revenue Code of 1954. If the Nordhoff Street property was "purchased" on or before December 31, 1958, it constitutes qualified replacement property within the provisions of section 1033 with the consequence that the entire amount of the gain realized upon the sale of the West Poplar Street property is entitled to nonrecognition for tax purposes. The Commissioner contends the Nordhoff Street prop-

erty was not purchased until January 23, 1959. The time of this purchase for the purpose of section 1033 is the only issue submitted for our decision.

The evidence upon which this question is to be decided is set out here in detail.

On October 16, 1958, Johnston wrote Harold C. Boyer (hereinafter referred to as Boyer), 20655 Nordhoff Street, Chatsworth, Calif., in reference to the Nordhoff Street property:

DEAR MR. BOYER:

I want to jot down a proposal along the lines of our discussion, for purchase of your land that you may wish to discuss with your attorney.

I can be in a position to make the down payment of $20,000. at any time—even prior to January 1 if you would desire in order to give you assurance of a definite sale.

I propose a $10,000, payment on principal, plus interest on unpaid principal at the rate of 5% per annum on or before December 31, 1959, with two such payments per year (at June 30 and at December 31) beginning with 1960 until the total agreed price of $200,000. is paid off.

However, you would have the option to call all of the balance ($100,000.) on December 31, 1963 if you so desire. We in turn would like to have an option to pay off the entire balance without penalty at any time after June 30, 1961 if we should so desire. We would also like an option to pay off before that date under terms of some reasonable penalty if we should desire to do that—in order to meet possible financing requirements.

You would have the option to continue occupancy of the house and barn area through June 30, 1961 at a rental of $100. per month. However, you would also have an option to give up occupancy of the house prior to that date if you so desired.

Under the proposed terms, payments might run through June 30, 1968 if neither of us exercised our options for earlier payment.

As I have indicated above, interest at 5% per annum on unpaid principal would be added to principal payments as these become due in turn.

I have set this up on the basis of a gross $30,000 principal payment prior to the end of 1959 and semiannual of principal and interest thereafter. If you would prefer that payments of principal and interest be made on a quarterly basis rather than a semiannual basis, we would be agreeable.

Yours truly,

HERRICK L. JOHNSTON

HLJ : hs

P.S.—I would like to ask 90 days to go through escrow in order to allow adequate time for the usual legal checks, and so on. If an agreement can be reached along the lines of our discussion, it would thus be possible to close the sale in early January, or it might be possible to close during December if that would better fit your tax needs.

H.L.J.

On October 24, 1958, Johnston and Boyer executed "Buyer & Seller Escrow Instructions" to Security-First National Bank of Los Angeles

(hereinafter referred to as Security-First National). The pertinent provisions follows:

BUYER

*     *     *     *     *     *     *

PRIOR TO January 24, 1959, I will hand you $20,000.00 of which $10,000.00 is to be deposited upon buyer's execution of these instructions, and any additional funds and instruments necessary on my part to enable you to comply with these instructions, which you are to use provided on or before * * * [Jan. 24, 1959] you hold the money and documents, if any, deliverable to me under these instructions and instruments have been filed for record entitling you to procure Title Insurance & Trust Co. Standard Coverage Form or Joint Protection policy of title insurance, with the title company liability for the amount of total consideration on * * * [the Nordhoff Street property], showing Title vested in Herrick L. Johnston, a married man. Free of encumbrances except: General and Special Taxes for fiscal year 1958, 1959, and taxes which are not yet due; INCLUDING SPECIAL DISTRICT LEVIES, PAYMENT OF WHICH IS INCLUDED THEREIN AND COLLECTED THEREWITH. Rights, rights of way and easements for public utilities, alleys and streets; and covenants, conditions, and restrictions; now of record, if any, including an easement along the south 30 feet for roads and water pipes, and an easement for road purposes over the westerly 30 feet as granted to Valley Orchard and Land Co. * * *. Mortgage or Trust Deed securing an indebtedness as per its terms, now of record (Lender's statement to show an unpaid balance of principal of $none, but if same should show to be more or less than said amount, then you are to keep the total consideration the same as shown above, by accordingly adjusting the CASH THROUGH ESCROW).

Trust Deed on your usual form securing Note for $180,000.00, dated during escrow, due (if straight note) favor of Harold C. Boyer, a married man, as community property or order payable at your Branch _____ interest from * * * [close of escrow] at rate of 5 per cent per annum, payable semi-annually beginning June 30, 1960 principal payable $10,000.00 or more on the 30th day of each sixth month, beginning on the 30th day of June, 1960, and continuing until said principal and interest have been paid; executed by above Grantee(s) and said note to recite: "On Dec. 31, 1959 the sum of $10,000.00 or more on principal plus accrued interest then due, shall be due and payable."

Said note also to recite: "An [sic] any time on or after June 30, 1963, privilege is granted to the Beneficiary to declare the full unpaid principal balance and accrued interest due and payable, upon Beneficiary giving to the Trustor six months prior written notice of such intention."

Above Trust Deed to recite: "This Deed of Trust is given as part of the purchase price of the above described property."

Above Trust Deed is also to recite: "In executing, delivering and accepting this trust deed and the note thereby secured, it is mutually agreed by trustor and beneficiary that so long as no default shall occur in the terms of this trust deed or said note, trustor, or his successor in interest shall be entitled to demand and receive and beneficiary shall furnish a Request for Partial Reconveyance of a portion of the property herein described for a railroad spur right of way, upon additional payment for such portion of a sum figured at the rate of $15,000.00 per acre for same, plus accrued interest on the amount so paid to date of such payment, together with cost of preparation and execution of the Partial Recon-

veyance demanded. Such payment shall be applied upon the last amount of the principal required to be paid according to the terms of said note. Neither the acceptance of such payment nor the issuance of such Request for Partial Reconveyance shall affect the liability of trustor or the lien of this trust deed upon the remainder of the property herein described for the full amount of the indebtness remaining unpaid."

*       *       *       *       *       *       *

If the conditions of this escrow have not been complied with prior to the date set out on line 1, or any extension thereof, you are nevertheless to complete the escrow as soon as the conditions, except as to time, have been complied with, unless written demand shall have been made upon you not to complete it.

Affix $220.00 U.S.R. Stamps on deed, to be paid by SELLER.

The following adjustments are required in this escrow: Interest on Mortgages and/or Trust Deeds of record, and Mortgage Insurance Premium paid F.H.A. in advance, to none, and funds shown impounded for future payment of taxes, insurance, etc.; all based on Beneficiary's statement. Interest on new encumbrances by endorsements on notes to close of escrow. Taxes, including all items appearing on tax bill except taxes on personal property not conveyed through this escrow, to close of escrow based on latest tax figures in your possession.

(Premium on Fire Insurance Policies to close of escrow on building situated either on property described above or on * * * [the Nordhoff Strret property]. * * *

* * * "Close of escrow" shall mean the day papers are filed for record. * * *

I agree to pay on demand for recording deed, mortgage clause on insurance, filling in Trust Deed, filling in, notarizing and recording any other documents necessary on my part, and buyer's escrow fee as charged.

Seller agrees to pay prior to delinquency, any tax on personal property not being sold herein, which tax is a lien on the real property being conveyed.

*       *       *       *       *       *       *

SELLER

October 24, 1958

I HEREBY APPROVE AND AGREE TO BE BOUND BY THE FOREGOING INSTRUCTIONS AND PROVISIONS. PRIOR TO the date set out on line 1 herein, I will hand you all instruments and money necessary for me to comply therewith, including a deed of the property described, executed by Harold C. Boyer and Eva H. Boyer, his wife which you are authorized to deliver provided you hold in this escrow for the account of the parties executing said deed the money and instruments deliverable to me under these instructions. When property being conveyed is held in Joint Tenancy any cash derived therefrom in this escrow shall be Joint Tenancy funds. Pay any encumbrances necessary to place title in the condition called for and the following:

Pay commission of $ none to _____ * * * When available Seller will hand you 1958 Tax Bill and funds to cover first installment, which you are instructed to pay immediately and in any event prior to delinquency.

*       *       *       *       *       *       *

Additional Escrow Instructions                    October 24, 1958

To Security-First National Bank of Los Angeles

My previous instructions in the above numbered escrow are hereby modified— supplemented in the following particulars only:

It is satisfactory that title policy will show the exception of one-half of all minerals, oil, gas and other hydrocarbon substances produced, stored or saved from said land, as reserved by Huntington Hartford, a married man, as his separate property * * *.

It is agreed between buyer and seller with which your Bank is not to be concerned that seller has the option of continuing to occupy the house and barn area from close of escrow through June 30, 1961 at a renatl [sic] of $100.00 per month, with option to give up occupancy prior to June 30, 1961 if so desired.

At seller's expense order an easement search on the easement over the westerly 30 feet per deed at 4926/194 Deeds, with a view to eliminate said easement, if possible.

On October 24, 1958, Johnston paid $10,000 to the escrow agent.

In accordance with "Buyer & Seller Escrow Instructions" a grant deed to the Nordhoff Street property dated October 24, 1958, in favor of Herrick L. Johnston, was signed by Boyer and his wife on October 28, 1958, and deposited with Security-First National. The grant deed was recorded and delivered out of escrow to Herrick L. Johnston on January 23, 1959.

In accordance with "Buyer & Seller Escrow Instructions," Herrick L. Johnston executed a note in the amount of $180,000 dated October 24, 1958. The note was deposited with Security-First National until the close of escrow on January 23, 1959.

Executed October 24, 1958, by Johnston as security for his $180,000 note, a deed of trust to the Nordhoff Street property was deposited with Security-First National and held in escrow until January 23, 1959, when it was recorded and delivered.

Security-First National received a report dated November 6, 1958, from Title Insurance & Trust Co., Los Angeles, reporting as of November 3, 1958, the status of the title, for title insurance purposes, of the Nordhoff Street property:

The following is a report on the title to the land described in your application for a Policy of Title Insurance, and is made without liability and without obligation to issue such policy.

*        *        *        *        *        *        *

VESTEE:

HAROLD C. BOYER, a married man, as community property.

Exceptions:

1. General and special county and city taxes for the fiscal year 1958–1959, amount $2,758.43, including personal property tax of $36.37. First installment $1,397.40.

2. An easement along the south 30 feet of said land for roads and water pipes.

3. An easement for road purposes over the westerly 30 feet of said land, as granted to Valley Orchard and Land Company in deed recorded in book 4926 page 194 of Deeds.

4. Matters which may affect the title unless eliminated by statements of identity from vestee and new owner.

On December 12, 1958, Johnston wrote Security-First National regarding the title report:

I received a copy of the preliminary report by The Title Insurance and Trust Company concerning the Boyer property. Four exceptions are taken—number 4 reading "Matters which may affect the title unless eliminated by statements of identity from vestee and new owner." I am not sure that my copy contained a description of exception number 4 unless that relates to the half interest mineral rights reserved by Huntington Hartford. I would like to know if this is correct.

I note the comments regarding exception number 3—namely, the 30 foot easement for road purposes over the westerly 30 feet of said property, and the fact that a quit claim deed will be necessary to eliminate said easement. I presume Mr. Boyer is taking immediate steps to obtain the quit claim deeds from the twelve persons involved in order to give a clear title as regards this matter. This easement, if not eliminated, would, of course, prevent use of this portion of the land for industrial building and would probably make it difficult to obtain loans for erecting buildings on the property.

May I ask if the 50% interest in mineral rights held by Huntington Hartford would have any bearing on the utilization of this property for industrial purposes. For example, would your bank be influenced in the matter of advancing loans for construction of industrial property on this land if these mineral rights are held, as here, by a second party?

\*       \*       \*       \*       \*       \*       \*

[In handwriting—]

12/16 Mr. Boyer says he rec'd a copy of this letter.

On December 16, 1958, Security-First National wrote its response to Johnston:

The first paragraph of your letter of December 12th refers to exception No. 4 of the title report. This exception relates to matters disclosed by the statement of identity which you filled out when you were here at the Bank. To refresh your memory, we enclose a blank copy of the form.

Mr. Boyer advises that he received a copy of your letter of December 12th and as you know we advised him, as well as yourself, of what will be necessary to eliminate exception No. 3 of the title report.

As to the reservation by Huntington Hartford of an interest in oil, gas, minerals etc. our Bank would be influenced in making loans for industrial building purposes, inasmuch as it is our general policy in such cases to require that all surface rights be quit claimed to a depth of preferably 500 feet.

On January 20, 1959, Security-First National entered an order for title insurance on the Nordhoff Street property with Title Insurance & Trust Co.:

Covering \* \* \* [the Nordhoff Street property].
We enclose:
Statement of Information of (x) Present Owner (x) New Owner.
Deed executed by Boyer
$180,000.00 Trust Deed executed by Johnston

\*       \*       \*       \*       \*       \*       \*

DO NOT RECORD UNTIL YOU RECEIVE FURTHER WRITTEN RECORD-ING INSTRUCTIONS FROM US, THEN YOU ARE INSTRUCTED TO FILE DOCUMENTS FOR RECORD, when by so doing, you will issue your j/p Standard Coverage Form Policy of Title Insurance with liability of $200,000.00 covering the property described above and in the documents received from us and showing title vested in Herrick L. Johnston, a married man. Free of encumbrances except:

1. Second half General and Special Taxes for the fiscal year 1958–1959.

2. Rights, rights of way and easements, if any, for public utilities, over the rear and/or side boundary lines of said property and within five feet thereof and covenants, conditions and restrictions, if any; which have been on record over ninety days.

3. $180,000.00 tr.dd to record.

On January 20, 1959, Security-First National wrote Johnston requesting payment of $10,100:

Confirming our telephone advice, we understand Mr. Boyer is not obtaining the Quitclaim Deeds to eliminate the easement over the westerly 30 feet of the land.

For your information Mr. Boyer has advised as follows: "If my escrow with Mr. Johnston is not closed on or before January 24 it will not be possible for it to close at all. I do not want my land tied up after that date."

On January 22, 1959, Johnston paid $10,100 to Security-First National.

On January 27, 1959, Security-First National sent Johnston an escrow statement, which stated that the documents in escrow were recorded January 23, 1959; that the seller paid the real estate taxes on the Nordhoff Street property to January 23, 1959; that the purchaser paid the insurance premiums with respect to the property commencing January 23, 1959.

Johnston did not receive the right to possession of the Nordhoff Street property until after the close of the escrow on January 23, 1959. Boyer retained title and possession to the Nordhoff Street property throughout the term of the escrow and continued his occupation of the property after the close of the escrow on January 23, 1959, but after January 23, 1959, Boyer paid rent to Johnston at the rate of $100 per month.

The real estate taxes with respect to the Nordhoff Street property were prorated between seller and purchaser as of January 23, 1959. Interest with respect to the $180,000 purchase-money note executed by Johnston and which was deposited in escrow, did not begin to accrue until the close of the escrow on January 23, 1959. The premium on insurance covering the Nordhoff Street property was prorated between seller and purchaser as of the close of escrow on January 23, 1959.

We are here involved with section 1033(a) of the Internal Revenue Code of 1954. The pertinent parts of that section are set forth in the footnote.[2]

As heretofore stated, the only issue is whether Herrick L. Johnston made a timely "purchase" of the Nordhoff Street property. If he made the "purchase" before the end of 1958, petitioners win their case. Concerning this question, the parties disagree as to the consequences flowing from the escrow arrangement as of December 31, 1958.

Under California law the escrow instructions set forth above constitute an enforceable contract pursuant to which the legal title to the property would be conveyed on or after January 23, 1959, the date set for the close of the escrow. *Tuso* v. *Green*, 229 Pac. 329; *Brown* v. *Roberts*, 9 P. 2d 517; *Williams* v. *Rush*, 25 P. 2d 888.

The Commissioner contends this is not enough to constitute a "purchase" of the land within the time limits of section 1033. He points to the factors which indicate that as of the time the escrow contract was entered into no "property" was acquired, and that none of the burdens and benefits or incidents of ownership passed to Johnston, the putative purchaser. He points out that under the arrangements, legal title to the Nordhoff Street property was not to pass to Johnston until January 23, 1959; that the seller retained possession and control of the property and paid the taxes and insurance with respect to the property until January 23, 1959; also that the interest on Johnston's purchase-money note did not begin to run until January 23, 1959.

The term "purchase" is not defined in section 1033. Nor do the pertinent regulations define the term. We have not been referred to, nor do we find, any decided case precisely in point on the question as to when a purchase of property occurs for the purpose of section 1033.

---

[2] SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property * * * is compulsorily or involuntarily converted—

* * * * * * *

(3) * * * Into money * * * the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, *purchases other property* similar or related in service or use to the property so converted, * * * at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property * * *

* * * * * * *

(B) PERIOD WITHIN WHICH PROPERTY MUST BE REPLACED.—The period referred to in subpararaph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) *one year after the close of the first taxable year in which any part of the gain upon the conversion is realized,* * * *

(ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe.

[Emphasis supplied.]

However, having reference to cases involving analagous situations under the internal revenue statutes, we think, generally, that a "purchase" occurs when ownership of property is acquired. For instance, the date of acquisition of property is the date from which to compute the holding period of property for the purpose of determining whether gains are to be treated as capital gains rather than ordinary income. *McFeely* v. *Commissioner*, 296 U.S. 102.

Of course, the term "purchase" as here involved must be construed so as to effectuate congressional intent in enacting section 1033.

Both parties rely to some extent on *Ted F. Merrill*, 40 T.C. 66, affirmed per curiam 336 F. 2d 771 (C.A. 9, 1964). There, in determining when a taxpayer's holding period of real property in California ends for the purpose of section 1231, we gave great importance to the passage of investment risk, taking also into consideration the passage of other burdens and benefits with respect to the property. Here, the taxpayer did assume an investment risk, but as far as other burdens and benefits, including the passage of title, he can point to none as he could in *Merrill*. Legal title remained in the seller. Seller had to continue to pay taxes and insurance and remained in possession until January 23, 1959. We conclude that before that time petitioner had made no purchase of the property under section 1033.

Accordingly, we decide that petitioners cannot have the advantages of section 1033, recognizing in passing, that the purpose of that section is to relieve the taxpayer of unanticipated tax liability arising from involuntary condemnation of his property by freeing him from such liability to the extent that he reestablishes his prior commitment of capital within the period provided by the statute. *Filippini* v. *United States*, 318 F. 2d 841 (C.A. 9, 1963). No purchase of property occurred within the time limits of section 1033. Compare *Albert E. Dyke*, 6 T.C. 1134; *Morco Corporation* v. *Commissioner*, 300 F. 2d 245 (C.A. 2, 1962), affirming per curiam a Memorandum Opinion of this Court; and *Swenson* v. *Commissioner*, 309 F. 2d 672 (C.A. 8, 1962), reversing 37 T.C. 124.

If it be thought that this is a harsh result for petitioners, we point out that the revenue laws gave them 1 year after the close of their first taxable year in which to make their "purchase," or such later date as the Secretary (of the Treasury) or his delegate may designate on application of the taxpayers in such manner as the Secretary or his delegate may by regulations prescribe. Apparently no such attempt was made by the petitioners to secure an extension of time. Why, we do not know.

In view of concessions made by the parties on other issues,

*Decision will be entered under Rule 50.*