TENNESSEE NATURAL GAS LINES, INC., AND SUBSIDIARY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8100–76.    Filed October 30, 1978.

*W. W. Berry* and *James C. Gooch*, for the petitioners.
*John B. Harper*, for the respondent.

HALL, *Judge:* Respondent determined the following deficiencies in petitioners' income tax:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1970 | $8,048 | 1972 | $54,580 |
| 1971 | 77,620 | 1973 | 382,845 |

Petitioner Tennessee Natural Gas Lines, Inc. (Tennessee Natural), files its corporate income tax returns on a consolidated basis with its wholly owned subsidiary, petitioner Nashville Gas Co. (Nashville Gas). Due to concessions by both parties, the issues remaining for decision are:

(1) Whether Nashville Gas must restore deferred gain on its sale to Tennessee Natural of a liquefied natural gas (LNG) facility in 1973 or 1974; specifically, whether this sale was consummated for tax purposes in 1973 or 1974;

(2) The amount of the investment tax credit, if any, allowable to Tennessee Natural in 1973 with respect to its purchase of the LNG facility. Specifically:

(a) Whether Tennessee Natural or Nashville Gas first placed the LNG facility into service; and

(b) Whether the LNG facility is "public utility property" within the meaning of section 46.[1]

(3) The amount of (ADR) depreciation which petitioners are entitled to deduct in 1973, specifically, whether the LNG facility is depreciable in its entirety under asset guideline class 49.24 (trunk pipelines and related storage facilities) or partially under asset guideline class 49.23 (natural gas production plant).

## FINDINGS OF FACT

Most of the facts have been stipulated by the parties and are found accordingly.

Tennesse Natural Gas Lines, Inc. (Tennessee Natural), is a Tennessee corporation organized in 1945. It files its corporate income tax returns on a consolidated basis with its wholly owned subsidiary, Nashville Gas Co. (Nashville Gas), which is also a

---

[1]All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

Tennessee Corporation. At the time the petition herein was filed, the principal offices and places of business of both corporations were in Nashville, Tenn.

Tennessee Natural is a publicly held corporation classified as a "natural gas company" within the meaning of the Federal Natural Gas Act of 1938.[2] Tennessee Natural is principally engaged in the business of purchasing, transporting, and selling gas in Tennessee. Tennessee Natural sells natural gas for resale to its subsidiary, Nashville Gas; the remainder of Tennessee Natural's sales are primarily to three large industrial consumers in Davidson County, Tenn. Tennessee Natural is not regulated by the Tennessee Public Service Commission, but since it is a natural gas company within the meaning of the Federal statute, its operations are regulated by the Federal Power Commission (FPC). The FPC regulates the prices which Tennessee Natural charges Nashville Gas. The FPC regulates the volumes and priorities of natural gas sold by Tennessee Natural to its three large industrial customers, but not the prices.

Nashville Gas is a local gas distribution company. It purchases gas from Tennessee Natural and sells it at retail to approximately 62,000 residential, commercial, and industrial customers in the Nashville area. The operations of Nashville Gas and the prices it charges for its gas are regulated by the Tennessee Public Service Commission; Nashville Gas is not subject to the jurisdiction of the FPC.

Tennessee Natural purchases its gas from Tennessee Gas Pipeline Co. (Tenneco). In 1970, Tenneco informed Tennessee Natural that it could no longer increase the quantity of gas sold to Tennessee Natural in order to meet Tennessee Natural's peak requirements. In other words, during the winter, when consumption is highest, Tenneco could not supply gas to Tennessee Natural in excess of the amount previously contracted for. In 1970 and 1971, Tennessee Natural experienced considerable overruns on its contract with Tenneco, and as a result, Tennessee Natural had to pay $409,985 in penalties to Tenneco during those years. The overruns were caused by the large demand for gas by Nashville Gas' customers during the winter.

In response to these large penalties, Tennessee Natural's

---

[2]15 U.S.C. sec 717 (1970).

president assigned the chief engineer of Nashville Gas to make a study of means to increase Tennessee Natural's winter gas supply. A private consultant was hired; he reported that a liquefied natural gas (LNG) storage facility could solve the need for additional gas in the winter since gas can be stored in the summer (when demand is low) and used in the winter (when demand exceeds supply).

An LNG facility operates in three basic steps—liquefaction, storage, and vaporization. High pressure pipeline gas (at approximately room temperature) is cooled in the liquefaction process to minus 260 degrees Fahrenheit, converting the gas into a liquid for storage. Prior to cooling, however, impurities which might interfere with the liquefaction process must be removed. These impurities include the odorant placed into natural gas so that it can be smelled. Carbon dioxide and moisture are also removed from the natural gas, leaving pure natural gas (known as methane). The cooling of the natural gas is accomplished by a combination of refrigeration and pressure reduction. The liquefied natural gas is pumped into a storage tank, where it can be retained with the loss of only a small amount of "boil-off" each day. When additional gas is needed, the liquefied gas is pumped out of storage to vaporizers, which turn the liquefied gas back into natural gas at normal temperature. The gas then is reintroduced into the high pressure pipeline.[3] The LNG facility proposed to Tennessee Natural could liquefy gas at approximately 5 million cubic feet per day at 60° Fahrenheit and could store a total of 1 billion cubic feet of natural gas. Liquefied gas could be regasified at the rate of 100 million cubic feet per day.

In December 1971, the directors of Tennessee Natural approved the idea of constructing an LNG facility. Nashville Gas' chief engineer then obtained bids from several companies for construction of the LNG facility, and selected the bid made by Chicago Bridge & Iron Co. On February 22, 1972, the directors of Tennessee Natural passed a resolution approving in principle the construction of the LNG facility by Nashville Gas. On March 22, 1972, the Tennessee Public Service Commission granted approval for acquisition of the land and construction of

---

[3]In a natural gas production plant, gas which contains methane (natural gas), propane, butane, ethane, and various impurities is treated to remove the separate components. The natural gas which emerges from a natural gas production plant is placed in transmission pipelines and, with the addition of an odorant, is marketable.

the LNG facility by Nashville Gas, and construction began in May 1972.

At the time construction of the LNG facility began, no thought was given to possible regulatory problems if Nashville Gas operated the facility. The construction site was adjacent to Tennessee Natural's pipeline (and not near Nashville Gas' lines). This site was selected since it was the only place offering a large source of high pressure gas, electric power, water, and proper zoning.

Construction of the LNG facility proceeded on schedule. In June 1973, as the facility neared completion, Nashville Gas prepared to submit to the Tennessee Public Service Commission an application for regulatory approval of increased rates to finance the cost of the LNG facility. At this time, Nashville Gas' counsel recognized for the first time that because the LNG facility was physically attached to Tennessee Natural's interstate gas transmission line and the liquefied gas upon release from storage was released into that line, the LNG facility would be operating in interstate commerce. Accordingly, if Nashville Gas operated the facility, Nashville Gas would become for the first time subject to regulation by the FPC. The attorney's concerns were verified by members of the legal staff of the FPC.

To avoid the expense and trouble of double regulation (by both the Tennessee Public Service Commission and the FPC), Nashville Gas agreed, on advice of counsel, to transfer ownership and operation of the LNG facility to Tennessee Natural (which was already under FPC regulation). On July 16, 1973, Tennessee Natural and Nashville Gas entered into an acquisition contract, a precedent agreement, and a management contract. The acquisition contract obligated Tennessee Natural to purchase, and Nashville Gas to sell, the LNG facility within 30 days from the date the facility was ready to be placed into service or on November 1, 1973, whichever occurred later. This transfer, however, was made contingent "Upon the issuance, by all duly constituted regulatory authorities having jurisdiction, of all authorizations acceptable to Purchaser * * * upon completion of construction and the requisite testing of the LNG facilities * * * and upon notice given by the Vendor." The acquisition contract further provided that at closing, Tennessee Natural would pay Nashville Gas' book cost at the time of completion for the LNG facility. A portion of the consideration for the contract was that

Tennessee Natural agreed to enter into a precedent agreement with Nashville Gas to sell supplemental gas to Nashville Gas.

The precedent agreement between Tennessee Natural and Nashville Gas provided that Tennessee Natural would seek regulatory approval to render Supplemental Winter Service to Nashville Gas. Tennessee Natural agreed to furnish maximum daily Supplemental Winter Service of 100 million cubic feet of natural gas and 1 billion cubic feet Supplemental Winter Service during the winter season. The parties also entered into a management contract in which Nashville Gas agreed to manage and to furnish all administrative, accounting, and financing services relating to the operation and maintenance of the LNG facility. Tennessee Natural agreed to pay for these services all direct labor costs, an overhead charge of 30 percent of these costs, and 12½ percent of the salaries of certain Nashville Gas officers.

The purpose of these contracts was to guarantee that, for regulatory purposes, Tennessee Natural was the owner of the LNG facility. Even though the LNG facility was to be used primarily to furnish natural gas to Nashville Gas' customers during the winter, Nashville Gas had no intention of placing the facility in operation since such action would make Nashville Gas subject to FPC regulation. The boards of directors of Tennessee Natural and Nashville Gas ratified these contracts at meetings on August 23, 1973.

On August 1, 1973, Tennessee Natural filed with the FPC an application for a Certificate of Public Convenience and Necessity to authorize the acquisition and operation of the LNG facility. The application stated that, due to the peak demand requirements of Nashville Gas and the previous penalties incurred, the LNG facility was needed. After explaining the interstate nature of the LNG facility and that Tennessee Natural, rather than Nashville Gas, would own it, the application stated that "Tennessee Natural will deliver the regasified gas as supplemental winter service to its wholesale customers." On September 11, 1973, Tennessee Natural filed with the FPC an application for a Temporary Certificate of Public Convenience and Necessity. This application stated that the LNG facility would be available for service not later than the end of October or within the first 10 days of November 1973. The application further stated that

use of the facility was imperative to avoid large overrun penalties.

On November 5, 1973, the liquefaction part of the LNG facility was accepted from Chicago Bridge & Iron Co. by Nashville Gas. Nashville Gas began filling the storage tank on November 7, 1973; 93,781,000 cubic feet of natural gas were liquefied in November, and 132,278,000 cubic feet were liquefied in December. All of the gas which was liquefied, however, belonged to Tennessee Natural. When some of this liquid gas was regasified prior to December 31, 1973, it was not billed to Nashville Gas but rather was treated as part of Tennessee Natural's supply. The vaporization system—necessary to remove the liquefied gas from storage—was first tested on December 20, 1973, and on the LNG facility's log this test was listed as a "vaporizer check-out only." Testing of the LNG facility continued for more than a year, and the final acceptance of the LNG facility was not issued to Chicago Bridge & Iron Co. until March 17, 1975.

On December 28, 1973, the Tennessee Public Service Commission issued an order authorizing Nashville Gas to increase the rates it charged its customers for natural gas in order to reflect the increased prices Nashville Gas would have to pay to Tennessee Natural attributable to the LNG facility. The following day Tennessee Natural notified Nashville Gas that it intended to place the LNG facility in service on December 31, 1973, and that the acquisition contract would become effective on that date. Tennessee Natural also notified Nashville Gas that a supplemental gas sales contract should be executed as of December 31, 1973.

Although the FPC had not yet approved either Certificate of Public Convenience and Necessity, Tennessee Natural consummated the purchase of the LNG facility from Nashville Gas on December 31, 1973. On that date Tennessee Natural executed a promissory note for $6,050,000 payable to Nashville Gas.[4] The books of both companies showed that the transfer was made as of December 31, 1973; at all times prior to that date, the LNG facility was carried on Nashville Gas' books as "construction work in progress." Both companies also filed documents with the

---

[4] The balance of the total purchase price of $7,251,889 was reached by establishing an account payable to Nashville Gas of $1,889 and canceling Nashville Gas' debt to Tennessee Natural of $1,200,000.

Securities and Exchange Commission which reported that the transfer took place on December 31, 1973. In addition, Tennessee Natural paid property taxes on the LNG facility for the calendar year 1974, such taxes being assessed on all property owned by Tennessee Natural as of January 1, 1974. Legal title to the LNG facility, however, was not transferred until 1974.

On January 18, 1974, Tennessee Natural notified the FPC that, although no action had yet been taken on its request for a Certificate of Public Convenience and Necessity, Tennessee Natural had placed the LNG facility into service on December 31, 1973. The FPC issued a temporary Certificate of Public Convenience and Necessity on January 29, 1974. A permanent Certificate of Public Convenience and Necessity, authorizing acquisition and operation of the LNG facility, was issued by the FPC to Tennessee Natural on December 2, 1974. The primary reason for the delay in issuing the permanent certificate was the length of time needed for approval of the environmental impact statement.

During the time the LNG facility was under construction by Nashville Gas, the facility was subject to an indenture of mortgage dated July 1, 1946, executed by Nashville Gas to provide security for its outstanding bonds. Under the terms of the indenture, Nashville Gas was entitled to have property released from the lien of the indenture so long as Nashville Gas' property remaining under the indenture provided adequate security for the outstanding bonds. In attempting to obtain release of the LNG facility from the indenture, Nashville Gas' counsel wrote an opinion letter to the indenture trustee certifying that Nashville Gas had title to the LNG facility. On December 12, 1974, the trustee released the LNG facility from the lien of indenture. Nashville Gas had sufficient assets as of December 31, 1973, without regard to the LNG facility, to obtain release of the LNG facility from the lien of the indenture at that time.

On December 30, 1974, Nashville Gas executed and delivered to Tennessee Natural a warranty deed for the LNG facility. The delay in deeding the property was caused by the delay in the FPC's issuance of the permanent Certificate of Public Convenience and Necessity. With the exception of very small amounts of gas sold to an unrelated party, all the liquefied gas from the LNG facility has been sold to Nashville Gas.

Tennessee Natural's depreciable basis in the LNG facility is $6,784,082. Of this amount, $3,859,912 is properly attributable to the cost of the equipment used in converting the gas to a liquid and reconverting the liquid to a gas, and $2,924,170 is properly attributable to the cost of the liquefied gas storage tank and related facilities. Tennessee Natural uses the "class life" system of depreciation.[5] Tennessee Natural used asset guideline class 49.23 (natural gas production plant) for depreciation of the cost of equipment used in changing the state of the gas, and asset guideline class 49.24 (trunk pipelines and related storage facilities) for the cost of equipment used for storage. Tennessee Natural selected these asset guideline classes upon the advice of an independent auditor who informed Tennessee Natural that it (the auditor) had in its files copies of private rulings issued by respondent allowing such segregation for depreciation purposes of the assets which comprise an LNG facility.

In the statutory notice, respondent determined that Nashville Gas should not restore deferred gain from the sale of the LNG facility in 1973 since the sale occurred in 1974. Respondent further determined that Nashville Gas was entitled to an investment tax credit for the LNG facility at a rate of 4 percent (in lieu of the 7-percent rate claimed by Tennessee Natural) since the facility was "public utility property" first placed in service by Nashville Gas. In the alternative, respondent determined that if Tennessee Natural first placed the LNG facility into service, Tennessee Natural was limited to the 4-percent rate because the LNG facility was still "public utility property." Respondent also determined that the entire LNG facility should be depreciated under asset guideline class 49.24 of the ADR system.

### OPINION

### 1. *Date of Sale of LNG Facility*

The first issue is whether Nashville Gas must restore deferred gain on its sale to Tennessee Natural of the LNG facility in 1973 or 1974. This question turns on whether the sale was consummated for tax purposes in 1973 or 1974. Petitioners, Tennessee Natural and Nashville Gas, filed a consolidated return. When

---

[5]See sec. 167(m); sec. 1.167(a)–11, Income Tax Regs.; Rev. Proc. 72–10, 1972–1 C.B. 721.

one member of a consolidated group (Nashville Gas) sells an asset (LNG facility) to another member (Tennessee Natural) at a profit in a consolidated return year, the selling member defers its gain on its books and the buying member's basis for the asset is its cost. When the buying member later sells the asset to an outsider, the selling member then reports its gain. Sec. 1.1502–13(c), Income Tax Regs. If the property sold is subject to depreciation in the hands of the buying member, the selling member must account for the deferred gain at the same rate at which the buying member depreciates the asset. Sec. 1.1502–13(d), Income Tax Regs. Nashville Gas had a $600,000 gain on the sale of the LNG facility to Tennessee Natural as a result of deducting interest and taxes during the construction period. That gain has to be restored beginning in the year in which the sale occurred. Petitioners contend that the sale was consummated on December 31, 1973; respondent asserts that the sale was not complete until 1974. We agree with petitioners.

The question of when a sale is complete is essentially a question of fact. No hard and fast rules of thumb exist and no single factor is controlling. The test to be applied is a practical test, taking into account all the facts and circumstances and viewing the transaction in its entirety. *Commissioner v. Segall*, 114 F.2d 706, 709 (6th Cir. 1940), revg. 38 B.T.A. 43 (1938), cert. denied 313 U.S. 562 (1941). Among the factors to be considered in determining when a sale is complete are the transfer of legal title and the shift of the benefits and burdens of ownership of the property. *Merrill v. Commissioner*, 40 T.C. 66, 76 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964). Generally, a sale is complete upon the first of these events to occur. *Dettmers v. Commissioner*, 430 F.2d 1019, 1023 (6th Cir. 1970), affg. 51 T.C. 290 (1968).

In this case, Tennessee Natural agreed to purchase the LNG facility from its subsidiary, Nashville Gas, by contract dated July 16, 1973. This contract provided that, contingent upon regulatory approval, the sale would be consummated within 30 days from the date the LNG facility was ready to be placed into service or on November 1, 1973, whichever occurred later. Construction of the liquefaction portion of the LNG facility was completed on November 5, 1973, but the vaporizers were not tested until December 20 of that year. Tennessee Natural notified Nashville Gas on December 29, 1973, that the contract

would become effective on December 31, 1973, and on that date Tennessee Natural executed its promissory note for $6,050,000 payable to Nashville Gas. The books of both companies showed that the transfer was made as of December 31, 1973, and both companies reported to the Securities and Exchange Commission that the transfer took place on that date. In addition, Tennessee Natural paid property taxes on the LNG facility for the calendar year 1974, such taxes being assessed on all property owned by Tennessee Natural as of January 1, 1974.

The original contract for sale of the LNG facility provided, however, that the transfer was contingent upon the issuance by the proper regulatory authorities of the necessary authorizations. Permanent approval of the transfer was not granted by the FPC until December 2, 1974, although a temporary Certificate of Public Convenience and Necessity was issued on January 29, 1974. This temporary certificate was issued in response to Tennessee Natural's letter to the FPC dated January 18, 1974, in which Tennessee Natural informed the FPC that the LNG facility had been placed in service on December 31, 1973. The primary reason for the delay in final approval by the FPC was the length of time needed for approval of the environmental impact statement.

We agree with petitioners' contention that the benefits and burdens of ownership of the LNG facility passed to Tennessee Natural on or before December 31, 1973. Among the facts we consider important are: (1) Despite the original contract calling for an effective date upon the issuance of regulatory authorization, the sales contract was effectively amended on December 29, 1973, by Tennessee Natural's December 28, 1973, notification that the sale would become effective December 29, 1973, coupled with Nashville Gas' acquiescence in that change of date; (2) Tennessee Natural paid for the property on December 31, 1973; (3) the books of both companies reflect the transfer as of December 31, 1973; (4) both companies reported the sale to the Securities and Exchange Commission; and (5) Tennessee Natural paid the property taxes on the LNG facility from that date. This last fact strongly indicates that the burdens of ownership shifted, as petitioners contend, in 1973.

In contending that the sale was not consummated for tax purposes until 1974, respondent relies on two primary points. Respondent contends, first, that the sale was not complete until

the regulatory authorities had approved the transaction. Second, respondent emphasizes that Nashville Gas' counsel issued an opinion letter in December 1974 certifying that the LNG facility was still Nashville Gas' property. We conclude that respondent's reliance is misplaced. The regulatory approval was necessary before title to the LNG facility passed, but the benefits and burdens of ownership had been transferred in 1973. Similarly, the legal opinion issued by Nashville Gas' counsel only went to the legal title to the LNG facility, not to the actualities of ownership.[6]

Accordingly, we hold that the sale of the LNG plant occurred in 1973 and that deferred gain on the sale of the LNG facility must be taken into account in 1973.

## 2. *Investment Tax Credit*

The next issue is the amount of the investment tax credit, if any, allowable to Tennessee Natural in 1973 with respect to its purchase of the LNG facility. Respondent contends, first, that Tennessee Natural is not entitled to any investment tax credit since the LNG facility was first placed in service by Nashville Gas.[7] In the alternative, if the facility were first placed in service by Tennessee Natural, respondent contends that the credit should be limited to 4 percent because the facility is "public utility property" within the meaning of section 46(c)(3).[8] Petitioners, on the other hand, contend that Tennessee Natural is entitled to the full 7-percent investment tax credit for its purchase of the LNG facility. We agree with petitioners.

Section 38 allows a tax credit for the investment in certain depreciable property. The credit is allowed in the year the property is placed in service. Sec. 46(c)(1). Under section 46(c)(3)(A), however, the investment credit for "public utility

---

[6]The legal opinion was merely a necessary step in the transfer of title, since the LNG facility had to be released from the lien created by the indenture of mortgage on all of Nashville Gas' property. Nashville Gas had sufficient assets as of Dec. 31, 1973, to obtain release of the LNG facility from the lien of indenture as of that date.

[7]Respondent concedes that if Nashville Gas first placed the LNG facility into service, Nashville Gas is entitled to a 4-percent investment tax credit.

[8]The qualified investment in public utility property constructed or acquired and placed in service before Jan. 22, 1975, is four-sevenths of that allowable on other sec. 38 property. In effect the credit rate is 4 percent on such public utility property. Beginning Jan. 22, 1975, the credit for public utility property is the same as other qualifed property, namely 10 percent.

property" was limited to 4 percent in 1973. Section 46(c)(3)(B) provides, in relevant part, that "public utility property" is—

(B) * * * property used predominantly in the trade or business of the furnishing or sale of—

\*        \*        \*        \*        \*        \*        \*

(ii) gas through a local distribution system,

\*        \*        \*        \*        \*        \*        \*

if the rates for such furnishing or sale * * * have been established or approved by a State or political subdivision thereof, by an agency or instrumentality of the United States, or by a public service or public utility commission or other similar body of any State or political subdivision thereof.

The parties do not dispute that the LNG facility was first placed in service in 1973. See sec. 1.46–3(d)(1), Income Tax Regs. Petitioners assert that the facility was placed in service by Tennessee Natural and, accordingly, that Tennessee Natural is entitled to the 7-percent investment tax credit. Respondent, however, contends that Nashville Gas first placed the facility in service, and since Nashville Gas is a public utility the investment credit must be limited to 4 percent. Respondent argues this point even if we should find, as we did, that Tennessee Natural acquired the LNG facility on December 31, 1973; respondent contends the LNG facility was placed in service by Nashville Gas the previous November when the liquefaction of natural gas began.

In support of his contention, respondent relies on section 1.46–3(d), Income Tax Regs., which furnishes rules for determining when property is first placed in service. In relevant part, this regulation provides:

· (d) *Placed in service.* (1) For purposes of the credit allowed by section 38, property shall be considered placed in service in the earlier of the following taxable years:

(i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or

(ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity.

\*        \*        \*        \*        \*        \*        \*

(2) In the case of property acquired by a taxpayer *for use in his trade or business* (or in the production of income), the following are examples of cases where property shall be considered in a condition or state of readiness and availability for a specifically assigned function:

(i) Parts are acquired and set aside during the taxable year for use as replacements for a particular machine (or machines) in order to avoid operational time loss.

(ii) Operational farm equipment is acquired during the taxable year and it is not practicable to use such equipment for its specifically assigned function in the taxpayer's business of farming until the following year.

(iii) Equipment is acquired for a specifically assigned function and is operational but is undergoing testing to eliminate any defects. * * *

[Emphasis added.]

This regulation does not support respondent's position. Only Tennessee Natural could be entitled to an investment tax credit for the LNG facility since only Tennessee Natural had a depreciable interest in the facility. The LNG facility was not used in Nashville Gas' trade or business of furnishing natural gas to its customers; rather, the LNG facility was used in Tennessee Natural's trade or business of supplying natural gas to its customers, including Nashville Gas. Accordingly, Nashville Gas did not have a depreciable interest in the LNG facility. Sec. 167(a). Since an investment tax credit is allowable, in general,[9] only for property with respect to which depreciation is allowable, section 48(a)(1), Nashville Gas could not obtain the investment tax credit for the LNG facility.

Moreover, the facts of this case do not support respondent's contention. The LNG facility was not operational until at least December 20, 1973, when the vaporizers were first tested. Without the ability to regasify liquefied gas, an LNG facility is commercially useless. Tennessee Natural acquired the property within 2 weeks of this first test, which indicates strongly that Tennessee Natural wished to obtain the facility as soon as it became operational. Furthermore, when liquefaction of natural gas began, Nashville Gas had irrevocably committed itself to selling the facility to Tennessee Natural within 30 days of the date that the facility became operational. In addition, all of the natural gas which was liquefied in November and December 1973 belonged to Tennessee Natural; none of this gas had been sold to Nashville Gas when it was reintroduced into Tennessee Natural's pipeline prior to December 31, 1973.

Finally, we note that the portion of the regulations applying the state of readiness test refers to property acquired by a

---

[9]Respondent does not contend that any exception to sec. 48(a)(1), such as the exception for leased property in sec. 48(d), is applicable here.

taxpayer for use in his business. Nashville Gas did not intend to use the LNG facility in its business but rather was contractually bound to convey it to Tennessee Natural when it was ready to be placed in service. If we were to follow respondent's reasoning, any person who acquires (or constructs) fully operable section 38 property for the purpose of resale would have placed that property in service.[10] In other words, respondent's interpretation would bar investment tax credits for the purchasers of equipment in "turnkey" sales.[11] "The purpose of the investment credit was to encourage the purchase and use of new productive machinery by giving a limited tax incentive to those who would invest in such new equipment. It is apparent that the incentive was not for the sellers of such equipment." *Lockhart Leasing Co. v. United States*, 446 F.2d 269, 271 (10th Cir. 1971), affg. 54 T.C. 301 (1970).

We conclude that Tennessee Natural first placed the LNG facility into service and is entitled to the investment tax credit with respect to the facility. This holding, however, does not resolve the dispute between the parties, since respondent also contends that, even if Tennessee Natural is entitled to the investment tax credit, the credit should be only 4 percent since Tennessee Natural uses the LNG facility as "public utility property."

Respondent's contention is severalfold. He contends, first, that the LNG facility was used predominantly in "public utility activity." Sec. 1.46–3(g)(2), Income Tax Regs. Respondent argues that whether property is "public utility property" is determined by the use to which it is put, not by the property's ownership. In support of this argument, respondent relies on an analogy to section 1.46–3(g)(3), Income Tax Regs., which provides, in relevant part, that property leased by a lessor, where the leasing is not part of a public utility activity, to a lessee who uses such property predominantly in a public utility activity, is to be treated as public utility property for purposes of determining the investment tax credit. Respondent asserts that if the predominant use test is employed for leased property, a

---

[10]For example, using respondent's analysis, an airplane manufacturer should obtain the investment credit for every airplane it builds, since the plane, prior to delivery to the ultimate purchaser, is operational. We are certain that Congress did not intend this result. See H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 411–413, 505–506.

[11]In this case, Nashville Gas constructed the LNG facility and sold the facility, upon completion, to Tennessee Natural. In essence, this transaction constituted a "turnkey" sale of the facility.

similar test should be employed for the LNG facility which, although owned by Tennessee Natural, was, according to respondent, used by Nashville Gas.[12]

Respondent contends, second, that the legislative history of section 46 supports his conclusion that the LNG facility is "public utility property." Congress established the lower credit for public utilities since "much of its benefit in these regulated industries is likely to be passed on in lower rates to consumers, thereby negating much of the stimulative effect on investments." H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 412. Respondent contends that to allow Tennessee Natural the higher credit would frustrate this congressional purpose since the Tennessee Public Services Commission may combine Tennessee Natural's revenues with the revenues of Nashville Gas in determining the latter's rates. *Tennessee Public Services Commission v. Nashville Gas Co.*, 551 S.W.2d 315 (Tenn. 1977), cert. denied 434 U.S. 904 (1977).

Respondent contends, finally, that to allow Tennessee Natural the higher investment credit would be a victory for form over substance. Respondent argues that if the determination is based on ownership, utility companies could thwart congressional intent by merely shifting legal title to property.

We conclude that all of respondent's contentions miss the basic point: "public utility property" is defined as "property used predominantly in the trade or business of the furnishing or sale of * * * gas through a local distribution system." Sec. 46(c)(3)(B). In this case, Nashville Gas was in the trade or business of furnishing natural gas through a local distribution system, but Tennessee Natural was not in that trade or business. The LNG facility was used in Tennessee Natural's business of supplying gas *to* a local distribution system; Nashville Gas, not Tennessee Natural, was in the trade or business of furnishing gas *through* a local distribution system.[13]

---

[12]See also sec. 1.46–3(g)(4)(i), Income Tax Regs., which provides that if *a* taxpayer is engaged *in both* the production or transmission of gas and the local distribution of gas, sec. 38 property is considered to be used predominantly in the trade or business of furnishing gas through a local distribution system if expenditures for the property are chargeable to, inter alia, accounts 360 through 363 of the uniform system of accounts prescribed by the FPC. An LNG facility falls within accounts 360 through 363.

[13]Petitioners contend that if we hold that the LNG facility is "public utility property" since the gas is eventually sold through a local distribution system, there would be no principled distinction between the LNG facility and, for example, interstate gas transmission lines or wellhead production

Turning to respondent's three contentions, we find each of them to be unpersuasive. Respondent's contention that the predominant use of the LNG facility was for the benefit of Nashville Gas' local distribution system rests on a faulty premise. Respondent's argument ignores the language of section 46(c)(3), which refers to predominant use in specified trades or businesses. As we noted above, since Tennessee Natural is not in the trade or business of furnishing gas through a local distribution system, the predominant use test is inapplicable. We draw further support for our conclusion from section 1.46–3(g)(2), Income Tax Regs., which provides that if a taxpayer is engaged in both a public utility activity and another activity, the predominant use test is applied. We note that the test is applicable only after it is established that the taxpayer was engaged in public utility activity; Tennessee Natural was not engaged in such activity.

We also conclude that the test provided in section 1.46–3(g)(4)(i), Income Tax Regs., which refers to the uniform system of accounts, is inapplicable here. Although the LNG facility falls within the accounts for which a presumption is made that the property is used in the local distribution system, this presumption is used only if *a* taxpayer is engaged *in both* the local distribution of gas and either gas producton or transmission. In this case, Tennessee Natural and Nashville Gas are two taxpayers. See secs. 11(a) and 7701(a)(14).

Respondent's second contention, that the legislative history mandates the lower investment credit here, is similarly unpersuasive. In the first place, the legislative history is far from crystal clear. For example, the House Report to the Revenue act of 1971, H.Rept. 92–533, 92d Cong., 2d Sess. (1971), 1972–1 C.B. 498, 510, refers to the "public utility property of regulated companies."[14] From this language it can be inferred that ownership of the property by a regulated company is necessary

---

equipment. We concur. It is exactly this possibility which, we believe, Congress foreclosed when it limited "public utility property" to property used in a local distribution trade or business.

[14]This view of the meaning of sec. 46(c)(3) is also reflected in a letter to the Senate Finance Committee from the American Gas Association in connection with the Revenue Act of 1971. In this letter, in reference to coal gasification or LNG facilities and the investment tax credit, the association noted: "Plants of this kind would qualify for the full tax credit if undertaken by a non-utility with the sale of [gas] to the utility." Hearings on H.R. 10947 Before the Senate Comm. on Finance, 92d Cong., 1st Sess. 801, 803 (1971). The letter went on to request higher investment tax credits for utilities as well.

for the lower investment credit rate. Moreover, the language of section 46(c)(3) is sufficiently clear that resort to generalized language of purpose in the legislative history is not necessary in this case.

Finally, respondent argues that allowing the higher credit will exalt form over substance and promote a corporate shell game aimed at emasculation of the lower investment credit for public utility property. This case, however, does not present an example of intercorporate transfers solely for the purpose of tax avoidance; rather, this transfer was effectively required by the FPC unless Nashville Gas wished to submit to costly double regulation. We are mindful of the Supreme Court's recent admonishment in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978):

> In short, we hold that where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached, the Government should honor the allocations of rights and duties effectuated by the parties.

Absent any showing of tax avoidance purpose in this case, we conclude that the transfer of the LNG facility should be given effect for the purpose of determining the appropriate investment tax credit.

Accordingly, we hold that Tennessee Natural is entitled to the 7-percent investment tax credit for the LNG facility.

### 3. *Depreciation*

The next issue is the amount of depreciation which petitioners[15] are entitled to deduct in 1973. Specifically, we must determine whether the LNG facility is depreciated in its entirety under asset guideline class 49.24 (trunk pipelines and related storage facilities) or partially under asset guideline class 49.23 (natural gas production plant).

Section 167 allows as a depreciation deduction a reasonable

---

[15]We have concluded above that only Tennessee Natural had a depreciable interest in the LNG facility; accordingly, the depreciation is allowable to that company. Which company is entitled to the depreciation deduction, however, is not in dispute since Tennessee Natural and Nashville Gas filed a consolidated return—respondent concedes that depreciation for the LNG facility is allowable to one of the two companies in 1973.

allowance for the exhaustion, wear, and tear of property used in a trade or business. Section 167(m) provides:

(1) IN GENERAL.—In the case of a taxpayer who has made an election under this subsection for the taxable year, the term "reasonable allowance" as used in subsection (a) means (with respect to property which is place in service during the taxable year and which is included in any class for which a class life has been prescribed) only an allowance based on the class life prescribed by the Secretary or his delegate which reasonably reflects the anticipated useful life of that class of property to the industry or other group. The allowance so prescribed may (under regulations prescribed by the Secretary or his delegate) permit a variance from any class life by not more than 20 percent (rounded to the nearest half year) of such life.

If a taxpayer elects to employ this "class life" system for a taxable year, the election applies to all of the taxpayer's additions to eligible property that year. The taxpayer's election, made with the return for the taxable year, may not be revoked or modified for any property included in the election Sec. 1.167(a)–11(a)(1), Income Tax Regs.

When a taxpayer elects the "class life" system, the taxpayer records all of his eligible assets in so called "vintage accounts." Each vintage account consists of an asset, or a group of assets, placed in service in the same year and in a single asset guideline class. Sec. 1.167(a)–11(b)(3)(i), Income Tax Regs. An asset guideline class is defined as the category of assets for which a separate asset guideline period is in effect for the taxable year. The asset guideline periods are set forth by respondent in Rev. Proc. 72–10, 1972–1 C.B. 721. In addition, for each asset guideline class an asset depreciation range (ADR) 20-percent shorter and 20-percent longer than the asset guideline period is also usually provided. See sec. 1.167(a)–11(b)(4)(i) and (ii), Income Tax Regs. A taxpayer who has elected to use the class life system is entitled to use any period of years within the ADR for a specific vintage account as the useful life of the assets in that account. In other words, the ADR provides the taxpayer with predetermined useful lives for assets for depreciation purposes; the class life system spares the taxpayer the burden of establishing the useful lives of assets on an asset-by-asset basis.

The following guideline classes and ADRs' relevant to this issue are set forth in Rev. Proc. 72–10, 1972–1 C.B. 721:

| Asset guideline class | Description of assets included | ADR (in years) |
|---|---|---|
| 49.23 | Natural gas production plant ........... | 11–17 |
| 49.24 | Trunk pipelines and related storage facilities ................ | 17.5–26.5 |

The parties to this case agree that the only issue herein with respect to depreciation is whether the LNG facility falls totally within class 49.24 or partially in that class and partially in class 49.23.

An LNG facility operates in three basic steps—liquefaction, storage, and vaporization. High pressure pipeline gas is treated to remove impurities and odorant, leaving pure natural gas (methane). This methane is then cooled to minus 260 degrees Fahrenheit by a combination of refrigeration plus reduction in pressure, at which point the gas liquefies. The liquid gas is pumped into a storage tank, where it can be retained for long periods of time. When additional gas is needed, the liquid methane is pumped out of storage to vaporizers, which turn the liquefied methane back into a gas. The gas can then be reintroduced into normal gas transmission pipelines.

Although petitioners concede that the storage and pipeline portions of the LNG facility are allocable to asset guideline class 49.24 (trunk pipelines and related storage facilities), they contend that the liquefaction and vaporization portions of the facility belong in asset guideline class 49.23 (natural gas production plant).[16] They rely on the fact that the equipment contained in and functions performed by the liquefaction and vaporization portions are similar to those of a natural gas production plant. Specifically, petitioners emphasize that in the liquefaction process impurities are removed from the gas, just as impurities are removed from natural gas at the wellhead. Respondent, on the other hand, contends that the LNG facility is nothing more than a complicated storage facility and, accordingly, that only asset guideline class 49.24 is applicable. Respondent emphasizes that the natural gas which enters the facility is already in a marketable state—further purification is needed for purposes of storage, not marketing.

This case presents a classic example of technology changing faster than the guideline classes prescribed by respondent. In

---

[16]If we accept petitioners' contention, the parties have stipulated the amounts which would be allocable to each class.

1976, a specific asset guideline class for LNG facilities, class 49.25, was added.[17] This change, however, is of little solace to this Court, since we must decide which one of two classes, neither of which completely encompasses an LNG facility, was more appropriate in 1973.

We conclude that we must sustain respondent's determination. In so doing, we rely heavily on section 1.167(a)–11(b)(4)(ii)(*b*), Income Tax Regs., which provides:

> For purposes of this section, property shall be included in the asset guideline class for the activity in which the property is primarily used.

We note that this regulation does not refer to the *nature* of the equipment or the *manner* in which it operates; rather, this regulation emphasizes the *use* to which the equipment is put. In this case, the sole use of the entire LNG facility is to make natural gas suitable for storage. Marketable natural gas enters the facility, is stored, and approximately the same volume of marketable natural gas leaves the facility when the gas is needed for consumption. In no way is a marketable product *produced* by the LNG facility—a marketable product is merely *stored* there.

Petitioners rely on three private letter rulings, issued by respondent to other taxpayers, in which the division of an LNG facility into two asset guideline classes for depreciation purposes was permitted. It is well settled, however, that "where the Commissioner has issued a private ruling to one taxpayer, another taxpayer (who has not received a ruling) may not rely on the holding in the issued ruling so as to require that he be given the same treatment that the first taxpayer was accorded." *Teichgraeber v. Commissioner*, 64 T.C. 453, 456 (1975). No exception to this rule is applicable here. See *International Business Machines Corp. v. United States*, 343 F.2d 914 (Ct. Cl. 1965).

*Decision will be entered under Rule 155.*

---

[17]Asset guideline class 49.25 provides an asset depreciation range of 17.25–26.5 years—the same range as asset guideline class 49.24 provides for storage facilities. Rev. Proc. 76–27, 1976–2 C.B. 644.