MORGAN BROWN AYRES, JR. and CYNTHIA ANN AYRES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ayres v. Commissioner
Docket Nos. 12699-80, 12700-80, 12701-80, 12702-80, 12703-80, 12704-80, 12705-80, 12706-80, 12707-80, 12708-80, 12709-80, 12710-80, 12711-80, 12712-80, 17463-80.
United States Tax Court
T.C. Memo 1983-202; 1983 Tax Ct. Memo LEXIS 584; 45 T.C.M. (CCH) 1299; T.C.M. (RIA) 83202; April 12, 1983. Leslie Shields, for the petitioners. Charles W. Kite, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes and additions to tax for calendar years 1975 and 1976 in the following amounts: Deficiencies
Additions to Tax
in
Docket No.
Petitioners
Year
Income Tax
Sec. 6651(a)(1)
Sec. 6653(a) [2]
12699-80
Morgan Brown
1975
$9,489.00
Ayres, Jr.
and Cynthia
1976
2,171.00
Ann Ayres
12700-80
H. Calvin
1975
15,486.48
$774.32
Walter and
Anne F.
Walter
12701-80
Billy Joe
1975
29,735.85
Guess and
Barbara H.
1976
6,474.25
Guess
12702-80
Tom T. Pace,
1975
20,358.92
$1,017.95
Jr., and
Estate of
1976
1,778.71
88.93
Nancy H. Pace
12703-80
Campbell
1975
31,162.00
Wallace, Jr.
and Joan E.
1976
6,510.00
Wallace
12704-80
Morgan B.
1975
10,828.00
Ayres and
Patricia M.
1976
2,107.00
Ayres
12705-80
William R.
1975
31,387.24
Banks and
Marie Banks
1976
4,260.06
12706-80
Donald L.
1975
10,522.36
Jackson
1976
3,460.91
12707-80
Thomas M.
1975
10,605.01
Ayres and
Murray O.
1976
2,146.65
Ayres
12708-80
Jack T.
1975
33,452.20
Bush and
Eugenia C.
1976
6,760.91
Bush
12709-80
Tom T.
1975
3,830.64
Pace, III
1976
1,004.73
12710-80
W. Zane
1976
4,844.00
1,211.00
Daniel and
Darlene
Daniel
12711-80
Robert J.
1975
28,718.00
English
1976
6,173.00
12712-80
Roy A.
1975
8,176.00
Wedekind, Jr.
and Jean
1976
3,450.00
Wedekind
17463-80
Glen R.
1975
14,166.49
Claiborne
and Rhys G.
1976
12,167.57
Claiborne
*585 Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving the following issues for our decision: (1) Whether, for calendar year 1975, any petitioner is entitled to deduct a share of a claimed loss of an alleged partnership, which claimed loss resulted from deductions for depreciation and operating expenses incurred or paid during the period January 10, 1975, to October 28, 1975, and associated with certain buildings; and (2) whether H. Calvin Walter and Anne F. Walter timely filed their 1975 joint Federal income tax return and, if not, whether their failure to do so was due to reasonable cause within the meaning of section 6651(a)(1).
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Morgan Brown Ayres, Jr., and Cynthia Ann Ayres, husband and wife, who resided at the time of the filing of their petition in Knox County, Tennessee, filed their joint Federal income tax returns for the calendar years 1975 and 1976 with the Internal Revenue *586 Service Center, Memphis, Tennessee. Petitioners H. Calvin Walter and Anne F. Walter, husband and wife, who resided in Knoxville, Tennessee, at the time of the filing of their petition, filed their joint Federal income tax return for the calendar year 1975 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioners Billy Joe Guess and Barbara H. Guess, husband and wife, who resided in Knoxville, Tennessee, at the time of filing their petition, filed their joint Federal income tax returns for the calendar years 1975 and 1976 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioners Tom T. Pace, Jr., and Nancy H. Pace (who were husband and wife in 1975 and 1976) filed their joint Federal income tax return for the calendar years 1975 and 1976 with the Internal Revenue Service Center, Memphis, Tennessee. At the time that respondent issued the notice of deficiency, Nancy H. Pace was deceased, and respondent issued the notice of deficiency to her estate. Tom T. Pace, Jr., resided in Knox County, Tennessee, at the time of filing the petition. Petitioners Campbell Wallace, Jr., and Joan E. Wallace, husband and wife, who resided in Knoxville, Tennessee, *587 at the time of filing their petition, filed their joint Federal income tax return for calendar year 1976 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioners Morgan B. Ayres and Patricia M. Ayres, husband and wife, who resided in Knoxville, Tennessee, at the time of filing their petition, filed their joint Federal income tax returns for calendar years 1975 and 1976 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioners William R. Banks and Marie Banks, husband and wife, who resided in Knoxville, Tennessee, at the time of filing their petition, filed their joint Federal income tax returns for calendar years 1975 and 1976 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioner Donald L. Jackson, who resided in Knoxville, Tennessee, at the time of filing his petition, filed a joint Federal income tax return with his ex-wife, Mary Louise Jackson, for calendar year 1975 and filed a Federal income tax return as an unmarried head of household for calendar year 1976 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioners Thomas M. Ayres and Murray O. Ayres, husband and wife, who resided in Knoxville, Tennessee, *588 at the time of filing their petition, filed their joint Federal income tax returns for calendar years 1975 and 1976 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioners Jack T. Bush and Eugenia C. Bush, husband and wife, who resided in Dandridge, Tennessee, at the time of filing their petition, filed their joint Federal income tax returns for calendar years 1975 and 1976 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioner Tom T. Pace, III, who resided in Knoxville, Tennessee, at the time of filing his petition, filed his Federal income tax returns for calendar years 1975 and 1976 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioners W. Zane Daniel and Darlene Daniel, husband and wife, who resided in Knoxville, Tennessee, at the time of filing their petition, filed their joint Federal income tax return for calendar year 1976 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioner Robert J. English, who resided in Knoxville, Tennessee, at the time of filing his petition, filed his Federal income tax returns for calendar years 1975 and 1976 with the Internal Revenue Service Center, Memphis, Tennessee. *589 Petitioners Roy A. Wedekind, Jr., and Jean Wedekind, husband and wife, who resided in Knoxville, Tennessee, at the time of filing their petition, filed their joint Federal income tax returns for calendar years 1975 and 1976 with the Internal Revenue Service Center, Memphis, Tennessee. Petitioners Glen R. Claiborne and Rhys G. Claiborne, husband and wife, who resided in Knoxville, Tennessee, at the time of filing their petition, filed their joint Federal income tax returns for calendar years 1975 and 1976 with the Internal Revenue Service Center, Memphis, Tennessee. During 1974, Kyle C. Testerman and R. Dan Culp, a real estate developer, were general partners in the Tennessee general partnership of Northshore Center Operating (NCO). NCO was the beneficial owner of the office buildings Northshore I, Northshore II, and Northshore III (Northshore complex), located in Knoxville, Tennessee. Westwood Developers, Inc. (Westwood), as trustee for NCO, held legal title to the Northshore complex. [3] Mr. Testerman and Mr. Culp owned 100 percent of the capital stock of Westwood, and Mr. Culp was Westwood's president. Westwood managed to day-to-day operations of the Northshore complex *590 on behalf of NCO. Westwood had borrowed substantial amounts of money to utilize in the operations of the Northshore complex. In 1974, a first mortgage for approximately $5,734,000 existed against the Northshore complex property in favor of the Metropolitan Life Insurance Company (Metropolitan Life). A second mortgage of approximately $1,000,000 to the Crocker National Bank of California (Crocker Bank) encumbered the Northshore complex. By late 1974, the Northshore complex was near bankruptcy. Westwood found that its funds were insufficient to meet the expenses of the Northshore complex. The note to Metropolitan *591 Life was in arrears and Westwood owed approximately $1,400,000 to other creditors of the Northshore complex. Some creditors demanded payment and threatened foreclosure against the Northshore complex. In response to this financial distress, Mr. Culp discussed with Glen Claiborne the idea of creating a limited partnership to acquire an interest in the Northshore complex and to provide the funds required to cover the Northshore complex operating expenses. [4] Mr. Culp believed that, on behalf of Northshore complex, Westwood could utilize the capital contributions from limited partners as collateral to obtain new financing from outside financial institutions. Such new third party loans would finance the construction of Northshore IV, an additional office tower for the Northshore complex. *592 During November and December 1974, Mr. Claiborne discussed the limited partnership venture with potential investors. [5] A number of these individuals indicated their interest in becoming limited partners but none documented his intention in writing at that time. Mr. Claiborne believed that he was empowered to act as trustee on behalf of the individuals who indicated a desire to join the limited partnership venture. On January 10, 1975, an "Agreement of Purchase and Sale of Real Estate and Limited Partnership Agreement" was executed. The two agreements (hereinafter January 10 Agreement and Limited Partnership Agreement) were consolidated documents and were paginated in sequence. The Limited Partnership Agreement followed the January 10 Agreement; the latter document contained the signature lines and was the signed document. The January 10 Agreement was executed by and between-- WESTWOOD DEVELOPERS, INC., * * * Trustee for Northshore Center Operating, * * * hereinafter referred to as the "Seller", and Glen R. Claiborne, * * * as Trustee for himself, H. Calvin Walter, Tom *593 P. Pace III * * *, and Sam A. Mars, Jr., * * * as Trustee for himself and Pat Fultz and S.A. Mars, Jr., Inc., hereinafter referred to as Purchaser [the Claiborne group]. The agreement provided that Westwood "agrees to sell" and the Claiborne group "agrees to purchase" a 75 percent undivided interest in the Northshore complex. The pertinent terms and conditions of the January 10 Agreement were as follows: (1) The stated purchase price of the 75 percent interest was $1,625,000, payable by a purchase money mortgage note secured by a deed of trust. (2) For 3 years, payments would consist solely of interest in the amount of 10 percent of the purchase price. The 3-year period commenced on January 10, 1975, but interest for the first year would be due only upon satisfaction of all of seller's enumerated covenants. After 3 years, principal payments would be due and interest, which would accrue at a rate of 7.1 percent, would be due. (3) An abatement provision stated that-- No payment of principal or interest shall be required if any of the following conditions should occur or exist: (a) Should any foreclosure action be filed against any of the property owned by the Limited *594 Partnership which is hereinafter created. (b) Should there be any material breach of the repayment of any note secured by Limited Partnership real estate even though foreclosure action might not be undertaken. (c) Failure of the General Partner or its managing partner to fulfill the duties and obligations required of the General Partner or its manager, R. Dan Culp. (d) Upon the death or mental incapacity of the General Partner, or R. Dan Culp. (e) Upon the filing of bankruptcy, either voluntary or involuntarily by either the General Partner or R. Dan Culp. (f) If the cash flow from the operation of the Northshore Complex is sufficient to pay the mortgages due the Metropolitan Life Insurance Company and Crocker National Bank (Exhibits "B" and "C", or any substitutions thereof) and all of the terms of any mortgage note the Seller may execute which is secured by the property as provided by Paragraph II.A. below. (g) To the extent that the cash flow is sufficient to pay a part, but not all, of the note referred to in Paragraph II.A. below. (h) In the event a general creditors' bill is filed against either Westwood Developers, Inc., or R. Dan Culp. (i) If the General *595 Partner should fail to complete the construction of Northshore IV or in the event that Northshore IV is completed, or if the terms of occupancy and the like are not met pursuant to the terms of any construction money or permanent mortgage. (j) If Glen R. Claiborne as Trustee for all partners should determine that the partnership property or operation thereof should be in jeopardy and that additional funds would be fruitless to the operation of the partnership business. In the event that Glen R. Claiborne should be unable to make this determination by reason of death or other incapacity, the Limited Partners shall name a Substitute Trustee for this purpose. The Trustee's decision in this regard shall be in his absolute discretion and shall be subject to review only upon a showing of bad faith. (4) Purchaser agreed to acquire the property subject to a first mortgage note and deed of trust in favor of Metropolitan Life. (5) Purchaser agreed to assume pro rata liability subject to the payments of a second mortgage note and deed of trust granted to the Crocker Bank, but "expressly do [sic] not assume any responsibility for (a) any deficiency judgment * * *; nor (b) for *596 any payment that might be required under any 'acceleration' clauses * * *." (6) Seller agreed that "Closing hereof shall take place simultaneously with the execution hereof; at which time Seller shall deliver and Purchaser shall accept a general Warranty Deed conveying marketable fee simple title to said real estate * * *." (7) Seller covenanted the following: A. That prior to the payment of funds as herein provided Seller will demonstrate to the satisfaction of Purchaser that Seller is able to fund up to $1,400,000 for the purpose of retiring various miscellaneous debts of Seller which might attach to the title to the said real estate or adversely affect the operation of the improvements located by Seller on said real estate. In the event that it is necessary for Seller to pledge all or part of the property herein conveyed in order to accomplish said funding, Purchaser herewith agrees that Seller may do so and further agrees to execute a Deed of Trust in favor of any entity other than a party hereto which may provide such funding. Purchaser stipulates that should Purchaser's interest in said real estate be called upon to pay said indebtedness, then Purchaser shall have the *597 right but not the obligation of assuming such indebtedness to protect the purchaser's interest in the property and shall not otherwise be responsible for any of the indebtedness. B. Seller agrees to demonstrate to the satisfaction of Purchaser that Seller is prepared to construct upon a portion of the said real estate, an office building, containing at least 100,000 gross square feet, to house office space for rent. Said building is to be known as Northshore IV and will be an addition to certain existing improvements to said real estate which are known as Northshore I, II and III. Hereinafter said improvements shall be referred to collectively as Northshore Complex.
C. Seller shall demonstrate to the satisfaction of Purchaser that said Northshore I, II and III are occupied by paying tenants at ninety-two and five-tenths percent (92.5%) occupancy. (8) Seller and purchaser agreed to "diligently pursue the accomplishment of the conditions precedent to the cash funding of this transaction * * *." The January 10 Agreement incorporated the Limited Partnership Agreement which provided that upon execution of the document, a limited partnership, Northshore Associates, Ltd. (Northshore *598 Ltd.), "shall have formed." The general partner was Westwood, as trustee for NCO; the limited partners were "Glen R. Claiborne, Trustee, H. Calvin Walter, Tom T. Pace, III, * * * and Sam Mars, Trustee." The general partner would contribute its 25 percent undivided interest in the Northshore complex and property. The limited partners would make a capital contribution of-- (1) A 75% undivided interest in Northshore Center, * * *. (2) Up to $135,000 to be used for operating expenses in 1975. (3) Up to $100,000 to be used to defray operating expenses in 1976. (4) Up to $110,000 to be used to defray operating expenses in 1977. According to the Limited Partnership Agreement, profits and losses would be allocated as follows: Allocable Items
General Partner
Limited Partner
Net Profits
25%
75%
Tax Write-Offs
2%
98%
Distribution of Partnership Income: 1st $250,000
0
100%
After $250,000
25%
75%
Surplus Loan Proceeds from Financing
Northshore IV or refinancing entire
Project
25%
75%
Additionally, Westwood would hire Mr. Culp to manage the Northshore complex and to develop and execute a construction plan for the Northshore IV office *599 building.Westwood would become obligated "to sign personally or make whatever warranties necessary with respect to any and all loans required in the business of the partnership." The stated obligations of the limited partners were limited to their capital contributions and liability to Westwood under the terms of the purchase money mortgage. If a limited partner desired to assign or transfer his limited partnership interest, the remaining limited partners had a right of first refusal. Shortly after the execution of the January 10 Agreement, Mr. Claiborne wrote several letters to Mr. Culp and Sam Mars to advise them of the status of the limited partnership. On January 13, 1975, Mr. Claiborne wrote to Mr. Mars to confirm that all partners had signed the January 10 Agreement. On January 16, 1975, Mr. Claiborne wrote to Mr. Culp that some of "the prospective investors * * * indicated a reluctance to enter into a management agreement such as that attached to and made a part of our limited partnership agreement." Mr. Claiborne proposed certain modifications of the January 10 Agreement until "after you have met your conditions precedent as to occupancy and financing of the short-term *600 indebtedness, and * * * Until I have completed the funding of the $300,000, which I am obligated to do as soon as you have completed your conditions precedent." In a letter dated January 21, 1975, Mr. Claiborne wrote Mr. Mars that Pat Fultz had decided no to enter into the partnership venture. Mr. Claiborne indicated that Mr. Fultz's share might be placed with another individual, Dave. On April 3, 1975, Mr. Claiborne wrote Mr. Mars that the limited partners would not be required to fund the purchase of the Northshore complex until at least 90 days in the future. Mr. Claiborne indicated that he had given Pat Fultz more time in which to definitely decide whether he was interested in joining the limited partnership.
On October 11, 1975, the persons who had signed the January 10 Agreement signed an "Addendum to Limited Partnership Agreement of Northshore Associates" (Addendum). The Addendum provided that the abatement provisions would not be invoked except by affirmative vote of the majority of the limited partners. The Addendum did not modify any other provisions of the January 10 Agreement. As of January 1975, no one knew when Westwood would be able to satisfy the conditions *601 of the January 10 Agreement, but between January and October 1975, Westwood attempted to fulfill its obligation to satisfy the conditions. Although the Northshore complex had a lessee occupancy rate of 75 to 80 percent on January 10, 1975, the occupancy rate reached the required 92.5 percent by May 1975. Additionally, on January 10, 1975, Westwood was unable to convey insurable marketable title on the Northshore complex to the Claiborne group. The property's title had been clouded by problems relating to its boundaries and easements and by difficulties that arose as a result of prior owners having died intestate. These clouds were cleared by October 6, 1975. The January 10 Agreement additionally required Westwood to obtain $1,400,000 for the purpose of repaying outstanding debts that might otherwise encumber the Northshore complex and to locate financing to construct Northshore IV. Prior to executing the January 10 Agreement, Westwood had anticipated that the required financing might be obtainable by refinancing the first mortgage with Metropolitan Life; however, in July 1975, Metropolitan Life advised Mr. Culp that it refused to refinance the first mortgage. Mr. Culp sought *602 alternative financing and on October 28, 1975, obtained an $800,000 loan from the Hamilton National Bank of Knoxville (Hamilton Bank), [6] the predecessor of the United American Bank, and a $600,000 loan from the Valley Fidelity Bank of Knoxville (Valley Bank). [7] These funds were utilized to repay the $1,400,000 in outstanding debts of the Northshore complex. Westwood and NCO were unable to obtain sufficient financing to construct Northshore IV. On or about October 11, 1975, Mr. Claiborne agreed to waive the condition involving the construction of Northshore IV. At this juncture, Mr. Claiborne was notified that all of the nonwaived conditions in the January 10 Agreement had been met and that the sale could formally close on October 28, 1975. *603 Sometime between January 10, 1975, and October 28, 1975, in compliance with the terms of the January 10 Agreement, Mr. Claiborne executed a purchase money mortgage installment note in the amount of $1,625,000 and a deed of trust on the Northshore complex property in favor of Westwood.The note provided for quarterly payments of interest, commencing April 10, 1975; and beginning April 10, 1978, the quarterly payments of $67,000 would include both principal and interest. [8] The note included a provision that referred to a "trust deed of even date" and additionally a recourse assignment provision to the Hamilton Bank. The deed of trust, hand dated January 10, 1975, referred to the $1,625,000 purchase money mortgage note "of even date." The deed of trust was notarized on October 28, 1975, and was recorded with the Register's Office, Knox County, Tennessee, on October 29, 1975. [9]
*604 During the period of October 1975 through December 22, 1975, numerous individuals executed documents entitled "Contract of Membership of Northshore Associates, Ltd." (Contract of Membership). Each Contract of Membership set forth its purpose as follows: The Claiborne Group contemplated that at the time conditions precedent provided in the contract [January 10 Agreement] were performed by Westwood Developers, that capital in the amount of $300,000 would be required to complete the funding of the contract, and that other partners would be admitted for the purpose of contributing to this capital. NOW, THEREFORE, for and in consideration of the mutual obligations, rights and duties assumed by all parties to the attached Contract and Limited Partnership Agreement, and in consideration of the terms hereof, it is agreed: 1. That the limited partner is admitted as a member of the Claiborne group. 2. The Limited Partner shall pay the sum of [e.g. $8,333] * * * Each Contract of Membership was signed by Mr. Claiborne, as trustee for the limited partners of Northshore Ltd., and by the newly admitted limited partner. During 1979, Contracts of Membership were executed by twelve *605 of the seventeen individuals who ultimately became limited partners in Northshore Ltd. The names of the executing partners and the dates of execution are as follows: Name
Date
Brown Ayres
December 22, 1975
Morgan B. Ayres
December 22, 1975
Thomas M. Ayres
December 22, 1975
William R. Banks
October 28, 1975
Jack Bush
October 17, 1975
Zane Daniel
December 17, 1975
Robert J. English
October 19, 1975
Joe Guess
October 19, 1975
Donald Jackson
October 17, 1975
David A. Perkins
October 17, 1975
Campbell Wallace
December 9, 1975
Roy A. Wedekind
October 17, 1975
Mr. Claiborne maintained a checking account with the Hamilton Bank in the name of his law firm. On behalf of Northshore Ltd., Mr. Claiborne wrote checks on this account commencing on October 27, 1975.Most of the checks were payable to creditors, including Hamilton Bank and Valley Bank; however, between November 17, 1975, and January 7, 1976, Mr. Claiborne wrote four checks payable to Northshore, Ltd., which totaled $139,389.36. On July 2, 1976, Northshore Ltd. recorded a certificate of limited partnership with the Register's Office in Knoxville, Tennessee. The certificate of limited partnership *606 stated the names of the general partner and all 17 limited partners. [10] The certificate of limited partnership also listed each partner's cash and/or property capital contribution, the expected maximum annual additional contribution, the formula for allocating partnership income to the partners, a provision for right of first refusal to purchase a withdrawing partner's limited partnership interest, and miscellaneous other provisions. For calendar year 1975, the partnership income tax return of Northshore Ltd. showed an ordinary loss of $896,611.31. Northshore Ltd. filed an amended return for 1975 which reduced the reported ordinary loss to $830,826, calculated as follows: Income: Rent Income
$ 971,628 Conference Room Income
2,716 Expense Reimbursement
4,200 Miscellaneous
210 Total Income
978,754 Expenses: Depreciation
$442,204
Interest
760,498
Amort. of Loan Cost
16,674
Wages
61,970
Cleaning
76,962
Maintenance & Repairs
29,725
Office & Bldg. Supplies
11,522
Equip. Rents & Leased Lighting
13,615
Utilities
156,700
Professional Fees
11,149
Advertising
1,959
Telephone
11,800
Insurance
15,989
Property Taxes
113,621
Payroll Taxes
5,534
Management & Leasing Fees
55,735
Project Expense
2,644
Travel & Entertainment
18,801
Misc. Expense
2,478
Total Expenses
1,809,580 Loss
$ (830,826)
*607 On his Federal income tax return for calendar year 1975, each petitioner claimed a deduction for his proportionate share of the losses claimed to be incurred by Northshore Ltd. during the period of January 10, 1975, through December 31, 1975. Respondent in his notice of deficiency to each petitioner disallowed that portion of that petitioner's claimed losses of Northshore Ltd. applicable to the operations of the Northshore complex from January 10 to October 28, 1975 (300 days), allowing to each petitioner only that portion of the operating expenses, including interest paid and depreciation on the buildings of the Northshore complex, for the period after October 28, 1975 (65 days). The following schedule shows the partnership losses from the Northshore Ltd. partnership claimed by each petitioner for the taxable year 1975 and the amount of the claimed losses disallowed by respondent: Amount of 1975
Operating
Claimed Operating Loss
Petitioners
Loss - 1975
Disallowed by Respondent
Morgan Brown Ayres and
Cynthia Anne Ayres
$24,498.00
$20,957.00
H. Calvin Walter and
Anne F. Walter
36,747.05
31,436.05
Billy Joe Guess and
Barbara H. Guess
73,494.00
62,871.00
Tom T. Pace, Jr. and Estate of
of Nancy H. Pace
55,120.55
47,153.55
Campbell Wallace, Jr. and
Joan E. Wallace
73,494.00
62,871.00
Morgan B. Ayres and
Patricia M. Ayres
24,498.00
20,957.00
William R. Banks and
Marie Banks
73,494.00
62,871.00
Donald L. Jackson
36,747.00
31,436.00
Thomas M. Ayres and
Murray O. Ayres
24,498.00
20,957.00
Jack T. Bush and
Eugenia C. Bush
73,494.00
62,871.00
Tom T. Pace, III
18,374.00
15,719.00
Robert J. English
73,494.00
62,871.00
Roy A. Wedekind, Jr. and
Jean Wedekind
36,747.00
31,436.00
Glen R. Claiborne and
Rhys G. Claiborne
36,747.00
31,436.00
*608 In each deficiency notice, respondent explained that for the 300 days of 1975, from January 1 to October 28, the operating expenses and depreciation associated with the Northshore complex were incurred by NCO, and for the 65 days beginning with October 28, 1975, were incurred by Northshore Ltd. H. Calvin Walter and Anne F. Walter filed a joint Federal income tax return for 1975. On or before April 15, 1976, the Walters filed a Form 2688, Application for Extension of Time to File (Extension Application) for the 1975 return with the Internal Revenue Service Center, Memphis, Tennessee. The Extension Application requested May 15, 1976, as the extended filing date; Mr. Walter signed the Extension Application. Mr. Walter, after filing the Form 2688 with the Internal Revenue Service, listed June 14, 1976, on his office diary as the due date for filing his 1975 tax return. Mr. Walter mailed the 1975 return, along with a letter dated June 14, 1976, to the Memphis Internal Revenue Service Center; the envelope bore a postmark of June 14. The Memphis Internal Revenue Service Center received the return on June 15, 1976. In his notice of deficiency, respondent asserted a $774.32 addition *609 to tax under section 6651(a)(1) against the Walters with the explanation that-- Since your income tax return for the tax year 1975 was not filed within the time prescribed by law and you have not shown that the failure to file on time was due to reasonable cause, 5 percent of the tax is added as provided by section 6651(a)(1) of the Internal Revenue Code. OPINION The primary issue for decision--the amount of 1975 loss resulting from the operation of the Northshore complex which each petitioner is entitled to deduct--first necessitates a determination of when the Northshore I, II and III buildings became equitably owned by Northshore Ltd. If we determine that the date on which equitable ownership was assumed occurred prior to October 28, 1975, then we must decide whether Northshore Ltd. existed as a partnership prior to that date. The items which gave rise to each petitioner's claimed partnership loss from Northshore Ltd. consisted entirely of depreciation and operating deductions attributable directly to the Northshore complex. As a result, the date of formation of the partnership becomes unimportant, if, as respondent contends, Northshore Ltd. was *610 neither the beneficial nor the legal owner of the Northshore complex at the time that the depreciation and operating losses for the period January 10 to October 28, 1975, accrued. See Morco Corporation v. Commissioner,300 F.2d 245 (2d Cir. 1962), affg. a Memorandum Opinion of this Court; section 1.167(a)-10(b), Income Tax Regs. Because petitioners admit that Northshore Ltd. was not formally the legal owner of the Northshore complex until October 28, 1975, we must determine whether that alleged partnership became the beneficial owner of the property prior to that date. [11]
Relying on TennesseeNatural Gas Lines v. Commissioner,71 T.C. 74, 83 (1978), petitioners state that a purchaser becomes the beneficial owner of property when sufficient benefits and burdens of ownership pass to it. This is a correct statement of law. When the purchaser's *611 ownership attributes in real estate outweigh those that the seller retains, the purchaser is recognized as the beneficial owner, even if the transfer of these ownership characteristics occurs before delivery of the deed. When beneficial interest in the property has been acquired by the purchaser, the sales transaction is considered closed for Federal income tax purposes. 2 Lexington Avenue Corporation v. Commissioner,26 T.C. 816 (1956). Petitioners contend that the ownership attributes passed to Northshore Ltd. on January 10, 1975. They assert that, in determining the time of passage of the ownership characteristics, the critical factor is the intention of the parties as of January 10 to enter into a binding contract. They represent that such intention was present and was demonstrated through the terms of the January 10 Agreement, Mr. Claiborne's alleged January 1975 execution of the $1,625,000 purchase money mortgage note, his alleged May 1975 guarantee of a loan from Hamilton Bank, and his co-signing of a $63,500 promissory note to Masada-Burnswick during the first quarter of 1975. On the other hand, respondent takes the position that Northshore Ltd. became *612 beneficial owner of the Norshore complex at the same time that title passed to Northshore Ltd. Respondent contends that the sales transaction could not have closed until the clear title, occupancy terms, financing and construction conditions set forth in the January 10 Agreement had been satisfied or waived, which events occurred in October 1975. Citing Herbert J. Investment Corporation v. United States,360 F.Supp. 825 (E.D. Wis. 1973), affd. 500 F.2d 44 (7th Cir. 1974), petitioners argue that these terms from the January 10 Agreement were merely conditions subsequent. We do not find their argument persuasive; the Herbert J. Investment Corporation case is clearly distinguishable. There, the taxpayer, a trucking company, negotiated the sale of its assets to CW Transport, Inc. The agreement included all material terms and provided that the sale was subject to the approval of the Interstate Commerce Commission (ICC). With a temporary authority granted by the ICC, CW Transport, Inc. assumed management control on the date the contract, subject to the ICC approval, was signed. The Circuit Court stated in regard to the actions by CW Transport, *613 Inc. as follows (500 F.2d at 46): In a number of significant respects, the terms of the sale were linked to the temporary control date. Coincident with its takeover on April 1, CW replaced all Olson officers and all but one Olson director with officers and directors named by CW. Olson's tangible assets were sold for a cash price based largely upon net book values as of April 1.Interest on the cash portion of the purchase price was to accrue from the temporary takeover date until final consummation of the sale. Similarly, profits and losses occurring after April 1 accrued solely to CW. Based upon their own experience and the advice of competent counsel, the parties were convinced that final approval by the ICC would follow as a matter of course once temporary authority was granted. At all times, the parties were convinced that final approval by the ICC would be forthcoming. The courts held that the contract was binding because it fixed the obligations of both parties; the courts considered the need for ICC approval to be a condition subsequent since failure to obtain the approval was an extremely remote possibility. The courts reasoned that the taxpayer's actions *614 of disbanding its business and transferring control to CW Transport, Inc. were indicative of a binding obligation and of a transfer of ownership attributes. By contrast, in the instant case, on January 10, 1975, it was remote that all of the conditions--clear title, 92.5 percent occupancy, financing to enable repayment of $1,400,000 in outstanding debts, and construction funds to build Northshore IV--would be satisfied. The testimony is clear that when the January 10 Agreement was signed, no one knew when or whether the conditions might be met. Furthermore, petitioners did not become liable to pay the $1,625,000 purchase price until all the conditions were satisfied or waived. If these conditions had not been met or waived, petitioners would not have become so obligated and the property would not have exchanged hands. In our opinion, the conditions contained in the January 10 Agreement preclude a finding in favor of petitioners' argument that the sales transaction was closed on January 10, 1975. As a general rule the courts have held that sales transactions are considered completed for Federal income tax purposes where an agreement is a contract of sale and embodies all material *615 terms, does not contain unsatisfied significant conditions which might prevent the purchaser from exercising his ownership rights, provides for absolute and unconditional obligations by the purchaser to pay the purchase price and by which the purchaser receives immediate possession and exercises all the rights of ownership, and absolutely constrains the seller to deliver a deed upon the purchaser's payment. E.g., Commissioner v. Union Pacific R.R. Company,86 F.2d 637 (2d Cir. 1936), affg. 32 B.T.A. 383 (1935); Consolidated Gas and Equipment Co. of America v. Commissioner,35 T.C. 675, 684 (1961). By contrast, the courts consider the contract to be executory and the transaction to be incomplete where the contract does not absolutely bind the parties because it fails to include all material terms or it merely gives the purchaser a right to purchase property at some future time. Lucas v. North Texas Lumber Company,281 U.S. 11 (1930); Myers v. Commissioner,42 B.T.A. 640 (1940). Based upon these rules, the January 10 Agreement was not a binding contract of sale; rather, it was a contract to sell which *616 merely gave Northshore Ltd. a right to purchase the Northshore complex at a future time. This agreement contained significant terms and conditions which, until October 1975, prevented Westwood from transferring the ownership attributes to petitioners and forestalled petitioners' payment of the purchase price. Petitioners' further claim--that Mr. Claiborne's actions signaled a closed transaction--is unfounded. In our view, the evidence in the record does not support a finding that Mr. Claiborne actually signed the $1,625,000 purchase money mortgage note in January 1975 nor does the evidence show on what date he actually signed this note. The note states that it was of even date with the deed of trust which secured the note. The date of January 10, 1975, was typed on the note, but the note was neither hand dated nor notarized. While the trust deed to which the note referred was hand dated January 10, 1975, it referred to a property survey completed on October 6, 1975. The deed was notarized on October 28, 1975, and was recorded in the State Register's Office on October 29, 1975. Additionally, the record does not include documentation indicating that Mr. Claiborne guaranteed *617 a loan from Hamilton Bank in May 1975. [12]Hamilton Bank and Westwood entered into a loan agreement on October 28, 1975, but that agreement did not require Mr. Claiborne's guarantee. Lastly, Mr. Claiborne's having co-signed a $63,500 promissory note from Masada-Brunswick sometime between January and April 1975 does not prove that the January 10 Agreement was a binding sales contract. Petitioners did not show specifically the purpose for which the $63,500 was utilized. Although they imply that the funds were used to pay certain operating expenses of the Northshore complex, the money could have been utilized for purposes other than for the Northshore complex. This possibility is suggested by an October 27, 1975, check allegedly drawn to repay the $63,500 loan; the check was imprinted with the name and address of Mr. Claiborne's law firm and signed by Mr. Claiborne. If the funds had been utilized on behalf of the Northshore complex, under the Northshore complex management arrangement with Mr. Culp, it appears that Westwood, rather than Mr. Claiborne, would have repaid the funds. Moreover, it appears that pursuant to the terms of the Limited Partnership Agreement, Westwood was obligated *618 to personally sign or make all guarantees with respect to loans required for the operation of the Northshore complex. Thus, we conclude that Mr. Claiborne's actions were not necessarily indicative of a closed sales transaction. Other factors indicate that the ownership attributes of the Northshore complex did not pass from Westwood to petitioners on January 10, 1975. For example, the terms of the January 10 Agreement did not obligate petitioners to partially fund the transaction through an earnest money deposit or a downpayment. [13] We find it difficult to believe that even petitioners considered Northshore Ltd. responsible for the ownership burdens when they had assumed no financial liability for the Northshore complex. Additionally, the evidence does not indicate that a bank account was maintained *619 in the name of Northshore Ltd. or on behalf of the partnership into which rents could be deposited when collected from tenants of Northshore I, II and III and from which operating expenses could be paid. Since after January 10, 1975, Westwood was purportedly entitled to only a portion of the collected rent and responsible for a portion of the expenses, a separate account should have been maintained on behalf of Northshore Ltd. if that partnership owned a portion of the Northshore complex. We do not consider Mr. Claiborne's firm account to so qualify. Lastly, since Mr. Culp managed the daily operations of the Northshore complex before and after the execution of the January 10 Agreement, there was virtually no change in the management arrangement; this management arrangement is of no consequence in determining the equitable ownership of the Northshore complex. Thus, we find that the ownership attributes did not pass to Northshore Ltd. on January 10, 1975. *620 We are of the opinion that the benefits and burdens of ownership were transferred to Northshore Ltd. on or about October 28, 1975. At that time the conditions precedent had been satisfied or waived; Northshore Ltd. had become obligated to pay the purchase price of the property; legal title had been transferred; the $1,625,000 promissory note had been executed and delivered; and the deed of trust on the Northshore complex property had been recorded with the State Register's Office and pledged as collateral for bank loans. We have concluded that regardless of when Northshore Ltd. was formed, the Northshore complex was not transferred to it until October 28, 1975. It therefore becomes unnecessary to decide the date of the actual formation of the partnership since respondent has allowed each petitioner his pro rata share of the Northshore Ltd. loss which resulted from the operations of the Northshore complex from October 28 through December 31, 1975. [14]
*621 The final issue for our consideration is whether H. Calvin Walter and Anne F. Walter are liable for an addition to tax under section 6651(a) for failure to timely file their 1975 income tax return. Section 6651(a) provides that failure to timely file a Federal income tax return results in the application of an addition to the tax of 5 percent per month up to a maximum of 25 percent unless the taxpayer proves the failure is "due to reasonable cause and not due to willful neglect." [15]
*622 Mr. Walter takes the position that his failure to timely file the 1975 return was due to reasonable cause rather than willful neglect. The question of whether the failure resulted from "reasonable cause" is a question of fact, and the burden of proof is upon petitioners. Latham Park Manor, Inc. v. Commissioner,69 T.C. 199, 219 (1977), affd. in an unpublished opinion, 618 F.2d 100 (4th Cir. 1980); Shomaker v. Commissioner,38 T.C. 192, 202 (1962). On or before April 15, 1976, Mr. Walter mailed a Form 2688 Extension Application to the Memphis Internal Revenue Service Center. The application requested May 15, 1976, as the extended date for filing the 1975 tax return and Mr. Walter's signature appeared on the form. Mr. Walter testified that he was under the mistaken belief that his secretary had supplied him with and that he had used Form 4868, which would have automatically extended his filing date for 60 days until June 15, 1976. As a general rule, a taxpayer's failure to timely file may be due to reasonable cause if he has exercised ordinary business care and prudence. Dustin v. Commissioner,53 T.C. 491, 507 (1969), *623 affd. 467 F.2d 47 (9th Cir. 1972). Here, Mr. Walter totally relied upon his secretary to provide the appropriate extension application form.If Mr. Walter had read the form, he would have realized that the requested extension date was May 15, 1976. Instead, he signed the form without a thorough examination of its contents. In our view, Mr. Walter did not exercise ordinary business care and prudence in placing total reliance on his subordinate to obtain and correctly complete the proper IRS form, and we therefore find that the failure to timely file the 1975 income tax return was not due to reasonable cause. Accordingly, we approve respondent's determination of the addition to tax under section 6651(a). Because certain issues were disposed of by agreement of the parties, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated here-with: H. Calvin and Anne F. Walter, docket No. 12700-80; Billy Joe and Barbara H. Guess, docket No. 12701-80; Tom T. Pace, Jr. and Estate of Nancy H. Pace, dec'd, docket No. 12702-80; Campbell Wallace, Jr. and Joan E. Wallace, docket No. 12703-80; Morgan B. and Patricia M. Ayres, docket No. 12704-80; William R. and Marie Banks, docket No. 12705-80; Donald L. Jackson, docket No. 12706-80; Thomas M. and Murray O. Ayres, docket No. 12707-80; Jack T. and Eugenia C. Bush, docket No. 12708-80; Tom T. Pace, III, docket No. 12709-80; W. Zane and Darlene Daniel, docket No. 12710-80; Robert J. English, docket No. 12711-80; Roy A. Wedekind, Jr. and Jean Wedekind, docket No. 12712-80; and Glen R. and Rhys G. Claiborne, docket No. 17463-80.↩
2. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
3. According to the record, it appears that Westwood was not the sole legal owner of the Northshore complex property. The record includes testimony that Westwood held title to some portions of the property while title to other nominal portions were held in the names of Mr. Testerman, as trustee, and William W. Jones, as trustee for Mr. Testerman and Mr. Culp. However, because Mr. Testerman and Mr. Culp were the sole shareholders of Westwood, it would have been relatively simple for Westwood to acquire those portions of the property that it did not legally own.↩
4. Mr. Culp and Mr. Claiborne had a previous working relationship. They had worked together to develop a Knoxville, Tennessee, property known as TVA Towers. Mr. Claiborne had organized a limited partnership to purchase an interest in that property. Several of Mr. Claiborne's acquaintances and clients who were interested in becoming limited partners in TVA Towers were unable to do so because the number of available partnership interests were limited.↩
5. Two potential investors, Jack Bush and David Perkins were contacted after January 10, 1975.↩
6. The $800,000 loan from Hamilton Bank was made pursuant to a loan agreement between Hamilton Bank, as lender, and Westwood, as borrower.According to the terms of the loan agreement, Westwood granted Hamilton Bank the following: (1) Assignment of a $1,625,000 purchase money mortgage and deed of trust executed by Mr. Claiborne in compliance with the January 10 Agreement; this assignment was recorded with the State's Register's Office on October 29, 1975; (2) Personal endorsements of Mr. Culp and Mr. Testerman and personal guarantees by their wives; (3) a second lien deed of trust on certain real estate; (4) a junior mortgage deed of trust on some realty; (5) a first mortgage on and/or assignment of the leasehold interest of Mr. Culp, as trustee in a certain parcel of land; (6) a subordination agreement to subordinate the Management Agreement between Mr. Culp and Northshore Ltd.; and (7) an assignment of rents derived by Westwood from leases or operations of various properties. These various assignments were completed on October 29, 1975. The funds from the Hamilton Bank were deposited into Mr. Claiborne's account. ↩
7. Another source of funds during the first quarter of 1975 was Milton Turner, whose company, Masada-Brunswick, made a loan of $63,500. In return for the loan, Mr. Turner received a promise from Mr. Claiborne that the loan would be repaid from monetary capital contributions expected from the limited partners of Northshore Ltd.↩
8. In contrast, the January 10 Agreement provided that the quarterly interest payments would begin upon Seller's satisfaction of his stated conditions, regarding occupancy and borrowing founds. The record does not indicate the date on which petitioners actually commenced making the interest payments. ↩
9. The deed of trust refers to a survey of the property completed on October 6, 1975.↩
10. The 17 limited partners are Morgan Brown Ayres, Thomas M. Ayres, W. Zane Daniel, Morgan B. Ayres, Campbell Wallace, Robert J. English, Jack T. Bush, David A. Perkins, Billy Joe Guess, William R. Banks, Donald L. Jackson, Roy A. Wedekind, Glen R. Claiborne, H. Calvin Walter, S. A. Mars, Jr., Tom T. Pace, III, and Nancy H. Pace.↩
11. For purposes of determining the beneficial ownership issue, we assume, as does respondent on brief, that petitioners formed a partnership prior to or on October 28, 1975. However, this assumption is not a determination on the separate issue of the date that petitioners in fact created a partnership.↩
12. Mr. Claiborne testified at trial that he had guaranteed a loan from the Hamilton Bank.However, he did not state the date of the loan or its amount and dit not introduce documents to evidence the loan or guarantee. Mr. Claiborne merely testified that several checks introduced into evidence, which were drawn on October 27, 1975, were in partial repayment of this alleged loan.↩
13. Compare to Crosby Field v. Commissioner,T.C. Memo. 1971-225↩, where the purchaser made a downpayment pursuant to an agreement to purchase stock. The Tax Court found that a present contract of sale existed rather than an executory contract.
14. While we do not doubt that prior to January 10, 1975, most, but not all, petitioners had agreed to become limited partners in Northshore Ltd. at some future date, the record does not clearly indicate all conditions imposed on their becoming partners. The record shows that Northshore Ltd. was not registered with the State Register's Office as a limited partnership until July 2, 1976. Yet, as petitioners relate on brief, this delay in registration of the partnership name does not necessarily mean that for State law purposes a partnership was not formed prior to July 1976. Under the Uniform Limited Partnership Act adopted by Tennessee (Tenn. Code Ann., sec. 61-2-101 through sec. 61-2-130), a "limited partnership is formed if there has been substantial compliance in good faith with the requirements of subsection (a)" of sec. 61-2-102. Tenn. Code Ann., Uniform Limited Partnership Act, sec. 61-2-102(b). Subsection (a) provides that two or more persons may form a limited partnership by signing and swearing to a certificate of partnership which states such information as the name of the partnership, its location, the names of the general and limited partners, the amounts and types of initial and subsequent capital contributions of the partners, and the rights and obligations of the partners. It is clear from the Tennessee statutes that, as to outside creditors, in order to consider a venture's participant to be a limited partner, a certificate of limited partnership must be filed with the Register's Office. The cases hold that under certain circumstances where venture participants fail to file a certificate of limited partnership, the participants may be considered general partners. E.g., Ruth v. Crane,392 F.Supp. 724, 733 (E.D. Pa. 1975), affd. in an unpublished opinion, 564 F.2d 90 (3d Cir. 1977); Peerless Mills, Inc. v. American Tel. & Tel. Co.,527 F.2d 445 (C.A. 2d Cir. 1975); Dwinell's Central Neon v. The Cosmopolitan Chinook,587 P.2d 191, 194-195, 21 Wash. App. 929 (1978); Bank of Commerce & Trust Co. v. North,11 Tenn. App. 519 (1929). Therefore, in the instant case petitioners' failure to file a limited partnership certificate before July 1976 does not, standing alone, preclude a finding that they were partners before July 2, 1976.
However, the record here fails to show that all alleged partners were assembled as joint venturers on January 10, 1975. The January 10 Agreement was signed by Mr. Claiborne, as trustee for the Claiborne group, H. Calvin Walter, Tom T. Pace, III, and Sam A. Mars, Jr., as trustee. Although at trial Mr. Claiborne testified that he acted as trustee on behalf of all petitioners who did not sign the January 10 Agreement, the record shows that at least two of the participants had not been contacted by that date and that after that date one prospective partner withdrew. The alleged limited partner-beneficiaries had not executed any documents concurrently with the January 10 Agreement to indicate for whom Mr. Claiborne purportedly acted as trustee. It was not until October and December 1975 that twelve of the seventeen signed Contracts of Membership, each of which clearly stated that the undersigned individual "is admitted" to the Claiborne group and, as a limited partner of Northshore Ltd. concurrently has become obligated to make an initial capital contribution of a specified amount. In any event, because of respondent's treating the partnership as being in existence on October 28, 1975, and all petitioners as being partners on that date, it is unnecessary for us to decide the difficult questions of when this partnership was formed and when each petitioner became admitted as a partner to that partnership.↩
15. Sec. 6651(a)(1) provides as follows: (a) ADDITION TO THE TAX.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;↩